UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| G.E., the student; and S.B., the student's parent and legal guardian,<br><br>        Plaintiffs,<br><br>v.<br><br>WILLIAMSON COUNTY BOARD OF EDUCATION,<br><br>        Defendant. | Case No. 3:21-cv-00702<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

G.E., by and through his parent S.B., brings this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131–12165, appealing a state administrative law judge's (ALJ) decision finding that: (1) Defendant Williamson County Board of Education, doing business as Williamson County Schools (WCS), did not violate § 504's child find provisions by failing to identify and evaluate G.E. as a student who might have a disability during fifth and sixth grade; (2) G.E. was not eligible for special education services under the IDEA at the beginning of seventh grade; (3) WCS did not deny G.E. access to services in violation of § 504 or the ADA during fifth and sixth grade; and (4) G.E. and S.B. were not entitled to reimbursement for private school tuition, compensatory education, or other relief. (Doc. No. 1.) G.E. and S.B. have moved for judgment on

the administrative record. (Doc. No. 24.) WCS has responded in opposition (Doc. No. 27), and G.E. and S.B. have filed a reply (Doc. No. 28).

The District Judge referred G.E. and S.B.'s motion to the Magistrate Judge for a report and recommendation. (Doc. No. 30.) Considering the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that G.E. and S.B.'s motion for judgment on the administrative record be denied.

## I.      Background

### A.      Legal Background

#### 1.      The IDEA

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).[1] The IDEA defines a FAPE as:

> special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9)(A)–(D). To be considered a "child with a disability" under the IDEA, a child must have (1) "intellectual disabilities, hearing impairments (including deafness), speech or language

---

[1]      All citations to the U.S. Code and Code of Federal Regulations refer to their current versions. The relevant federal statutes and regulations have not substantively changed since the events at issue in this action occurred.

impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and" (2) must, "by reason thereof, need[ ] special education and related services." *Id.* § 1401(3)(A).

In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A). This mandate is known as the child find requirement, an affirmative obligation of every local educational agency (LEA) to identify students who are reasonably suspected of having disabilities and to evaluate those students to determine whether they are eligible for special education services. *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). The child find requirement is not limited to children enrolled in the public school system; it extends to "[a]ll children with disabilities residing in the State, including . . . children with disabilities attending private schools . . . ." 20 U.S.C. § 1412(a)(3)(A); *see also Doe v. Metro. Nashville Pub. Schs.*, 9 F. App'x 453, 455 (6th Cir. 2001).

Before a child may receive special education services, an LEA "shall conduct a full and individual initial evaluation" "to determine whether [the] child is a child with a disability" as defined in 20 U.S.C. § 1401 and "to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(A), (C)(i)(I)–(II). If a student is found to be a child with a disability who is in need of special education or related services, the LEA is "required to establish an [individualized education program (IEP)] for each child with a disability." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). "[T]he IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Knable ex rel. Knable v.*

*Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining requirements for IEPs).

A parent with concerns about "any matter relating to" the child's identification, evaluation, and educational placement may file a complaint with the school district and is entitled to an administrative due process hearing on the complaint. 20 U.S.C. § 1415(b)(6), (f), (g). Any party aggrieved by the state educational agency's final decision may file a civil action in federal district court. *Id.* § 1415(i)(2)(A). The IDEA empowers courts to "grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii).

## 2. Section 504

Students with disabilities may also receive services under § 504 of the Rehabilitation Act of 1973, which provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). Section 504's implementing regulations require that students with disabilities have equal access to public schools and that they receive a FAPE regardless of the nature or severity of their disabilities. 34 C.F.R. § 104.33. Section 504 applies to all students who have mental or physical impairments, who have a record of physical or mental impairments, or who are regarded as having a mental or physical impairment, if the impairment substantially limits one or more major life activities. *Id.* § 104.3(j). Like the IDEA, § 504's implementing regulations contain a child find obligation, requiring school districts to identify, locate, and evaluate children with disabilities who need or are believed to need special education or related services. *Id.* §§ 104.32, 104.35.

While "both statutes require the states to provide disabled children with a FAPE and impose child find obligations," "[a] principal difference between section 504 and the IDEA relates to the specific students covered by the statutes." *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-cv-293, 2009 WL 277051, at *6 (W.D. Mich. Feb. 2, 2009). Section 504 prohibits discrimination against students with disabilities as defined in 34 C.F.R. § 104.3(j), while the IDEA protects the "subsection" of those students who also "need special education and related services as a result of that disability." *B.H.*, 2009 WL 277051, at *6; *see also* 20 U.S.C. § 1401(3)(A). Accordingly, all students who qualify for special education services under the IDEA are also protected by § 504, but not all students who are considered to have qualifying impairments under § 504 are eligible for special education services under the IDEA. *B.H.*, 2009 WL 277051, at *6.

### 3. Title II

Like § 504, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Apart from [§ 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) (alteration in original) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). In educational discrimination cases where neither of these differences is at issue, courts "analyze [plaintiffs'] ADA and § 504 claims together." *Id.* at 453; *see also Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) ("We review claims brought under the Rehabilitation Act as we would claims brought under the Americans with Disabilities Act of 1990."); *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459–60, 463 (6th Cir. 1997) (holding that "the two statutes are quite similar in purpose and scope" and "the elements

of a Rehabilitation Act claim are largely similar to those of an ADA claim, with the additional requirement that the defendant be shown to receive federal financial assistance").

## B. Factual Background

G.E. attended Crockett Elementary School for fifth grade, the 2017–2018 school year. (Doc. No. 15-5.) School records show that G.E. was absent a total of forty days that year and tardy twenty-four times. (Doc. No. 15-12.) The administrative record contains emails and notes that S.B. sent to Crockett Elementary School personnel regarding G.E.'s absences in many of which S.B. stated that G.E. was absent because of physical illness or tardy because of traffic. (Doc. Nos. 15-5–15-17.) Crockett Elementary School Principal Bronwyn Rector testified that S.B. told her during a March 2018 meeting that G.E.'s absences were primarily due to doctor appointments and illnesses like strep throat and the flu. (Doc. No. 15-10.) Rector also testified that S.B. mentioned that G.E. had been struggling with anxiety, depression, and self-image and had started seeing a mental health professional at Vanderbilt Medical Center. (*Id.*) G.E. completed the fifth grade with average grades.

G.E. attended Woodland Middle School for sixth grade, the 2018–2019 school year. Even though G.E. and S.B.'s home was not zoned for Woodland Middle School, G.E. was able to attend the school for sixth grade without submitting an out-of-zone request due to a clerical error. G.E. had eighteen absences and thirty-six tardies during his sixth-grade year, and his teachers were initially concerned about his absences. However, G.E.'s final grades for the year were As, Bs, and Cs, and school personnel testified that G.E. participated in school activities, maintained friendships, exhibited appropriate social interactions with adults and peers, and performed comparably to his peers academically (Doc. Nos. 15-10, 15-11).

S.B. submitted an out-of-zone request for G.E. to return to Woodland Middle School for seventh grade, the 2019–2020 school year. WCS denied the request, and S.B. appealed with the

assistance of counsel. In support of the appeal, S.B.'s attorney sent a letter to two WCS school board members informing them that, "on August 14, 2018, [G.E.] was diagnosed with generalized anxiety disorder, mild major depressive disorder, recurrent episode[,] and oppositional defiant disorder" and attaching medical documentation of the diagnoses. (Doc. No. 15-14, PageID# 5650.) In the same letter, S.B.'s attorney asserted that G.E. "thrived" during sixth grade at Woodland, "performing at a high level[,]" engaging in "appropriate peer interaction and [forming] relationships" with students and staff. (*Id.*) WCS denied the appeal, S.B. and G.E. filed a due process complaint asserting violations of § 504 and the IDEA, and WCS initiated the process of evaluating G.E. for eligibility for special education and related services. As part of that process, WCS requested permission for its expert, Dr. Vance Sherwood, to conduct a clinical psychological evaluation of G.E. S.B. refused the examination.

WCS ultimately approved G.E.'s out-of-zone request to return to Woodland Middle School based on S.B.'s representation that they intended to lease a home within the Woodland zone during G.E.'s seventh-grade school year. G.E. attended Woodland Middle School for seventh grade, the 2019–2020 school year. WCS convened an IEP meeting on September 18, 2019, to determine G.E.'s IDEA eligibility. S.B. attended the meeting. The IEP team and S.B. agreed that G.E. did not meet the IDEA criteria for autism. The IEP team determined that G.E. also did not meet the IDEA criteria for emotional disturbance or other health impairment, but S.B. disagreed. S.B. argued that G.E. qualified for emotional disturbance and/or other health impairment classifications because G.E.'s anxiety caused excessive absences that adversely affected his educational performance. The IEP team found that, while G.E. displayed some characteristics of anxiety at home and at school, the data did not support finding that G.E.'s anxiety was the primary cause of

his absences or that his anxiety otherwise adversely affected his educational performance. S.B. declined WCS's offer to hold a § 504 meeting after the IDEA meeting. (Doc. No. 15-11.)

S.B. placed G.E. in the Rogers Behavioral Health OCD/Anxiety Partial Hospitalization Program from October 2019 through February 2020, during which time WCS provided G.E. with homebound instruction. WCS again offered to hold a § 504 meeting, but S.B. declined. WCS closed all of its schools in March 2020 due to the COVID-19 pandemic, and its schools remained closed for the rest of that academic year.

WCS approved G.E.'s out-of-zone request to attend Woodland Middle School for eighth grade, the 2020–2021 school year. WCS's expert conducted a clinical psychological evaluation of G.E. pursuant to a court order in August 2020. After the evaluation, WCS proposed holding another IDEA eligibility meeting in September 2020. G.E. and S.B. refused to participate and instead informed WCS that G.E. was being placed in a private program at Currey Ingram Academy.

### C. Procedural History

#### 1. Due Process Hearing

In July 2019, after WCS initially denied G.E.'s out-of-zone request for seventh grade, G.E. and S.B. filed a due process complaint alleging that G.E.'s absences triggered WCS's child find obligations under § 504 and the IDEA and that WCS violated these statutes by failing to evaluate G.E. earlier. (Doc. No. 15-1.) G.E. and S.B. filed an amended due process complaint in April 2020.

An ALJ in the Tennessee Department of Education Division of Special Education presided over a due process hearing held on January 11–15, February 2–4, April 15, 16, and 23, and May 10, 2021. G.E. and S.B. were represented by counsel, and more than twenty witnesses testified during the hearing. The ALJ issued a final written decision on July 12, 2021. (Doc. No. 15-17.) The ALJ's findings included that:

1.     The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2017–2018 school year.

2.     The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2018–2019 school year.

3.     The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2019–2020 school year.

4.     The Petitioners have failed to meet their burden of proof that G.E. is eligible for special education services under the IDEA.

5.     The Petitioners have failed to meet their burden of proof that G.E. was denied access to programs or services in violation of the Americans with Disabilities Act and/or Section 504 of the Rehabilitation Act.

6.     The Petitioners have failed to meet their burden of proof that G.E. is entitled to compensatory education, reimbursement for placement at Currey Ingram Academy, or any other requested relief.

7.     WCS is the prevailing party on all claims.

(*Id.* at PageID# 7227–28.)

### 2.     Federal District Court Proceedings

G.E. and S.B. initiated this action by filing a complaint under 20 U.S.C. 1415(i)(2), alleging that WCS violated § 504's child find provision and otherwise discriminated against G.E. in violation of § 504 and Title II for G.E.'s fifth-grade and sixth-grade years and that WCS violated the IDEA by finding G.E. ineligible for an IEP in his seventh-grade year. (Doc. No. 1.) G.E. and S.B.'s complaint seeks reimbursement for the costs of Currey Ingram, private tutoring and other educational supports, and leasing a home in the Woodland Middle School zone to keep G.E. enrolled during seventh grade. (*Id.*) It also seeks additional compensatory education, attorneys fees and costs, and any further equitable relief that may be necessary. (*Id.*) WCS filed an answer to the complaint (Doc. No. 13) and the sealed administrative record (Doc. Nos. 15–15-17). G.E. and S.B. filed a motion to supplement the administrative record (Doc. No. 19), which the Court denied without prejudice (Doc. No. 22).

9

## II.    Analysis

### A.    G.E. and S.B.'s § 504 and Title II Claims

G.E. and S.B.'s motion for judgment on the administrative record alleges that WCS violated § 504's child find provision for G.E.'s fifth-grade and sixth-grade years and otherwise discriminated against G.E. in violation of § 504 and Title II. (Doc. No. 1.) To prevail on their § 504 claims, G.E. and S.B. must proffer evidence that satisfies each of the following four elements:

> (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013) (quoting *Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 165 (6th Cir. 2003)). To prevail on their Title II claims, they must proffer evidence that satisfies the first three elements. *See McPherson*, 119 F.3d at 460.

The Sixth Circuit has held that satisfying the third element—showing that the defendant's challenged actions were discriminatory—"'requires that either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.'" *G.C.*, 711 F.3d at 635 (quoting *Campbell*, 58 F. App'x at 167). The Eighth Circuit explained the reasons underlying this requirement in *Monahan v. Nebraska*:

> The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [the IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap. An evaluation, in other words, is not discriminatory merely because a court would have evaluated the child differently.

> So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under [§] 504.

687 F.2d 1164, 1170, 1171 (8th Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983); *see also Campbell*, 58 F. App'x at 167 (quoting *id.*).

G.E. and S.B. have not argued or identified record evidence to show that WCS acted in bad faith or with gross misjudgment by failing to evaluate G.E. for § 504 eligibility or by refusing to provide him with reasonable accommodations under § 504 or Title II in fifth and sixth grade. Instead, they argue that they can succeed on their discrimination claims without making a showing of intent because "the Sixth Circuit distinguishes two methods for proving discrimination: intentional discrimination *and* failure to make reasonable accommodation." (Doc. No. 24, PageID# 7382.) G.E. and S.B.'s reliance on *McPherson v. Michigan High School Athletic Association, Inc.*, to support this argument is misplaced. (Doc. No. 24.) In *McPherson*, a plaintiff with learning disabilities who had been required to repeat eleventh grade asserted § 504 and Title II challenges to the Michigan High School Athletic Association's (MHSAA) rule that any student who had completed eight semesters of high school was ineligible for interscholastic sports competition. 119 F.3d at 455–56. In analyzing the plaintiff's claims, the Sixth Circuit explained that

> there are two methods that would allow the plaintiff to demonstrate that the MHSAA's actions were taken *because* of his disability: either (1) by offering evidence that learning disabilities were actually considered by the MHSAA in formulating or implementing the eight-semester rule, or (2) by showing that the MHSAA could have reasonably accommodated his disability, but refused to do so.

*Id.* at 460. The court found that the plaintiff failed to make either showing. *Id.* at 460–63.

Nothing in the *McPherson* court's analysis conflicts with the Sixth Circuit's later holding in *G.C.* that, "'at least in the context of *education* of handicapped children[,]'" the plaintiff must prove discrimination by showing "'either bad faith or gross misjudgment . . . .'" 711 F.3d at 635 (emphasis added) (quoting *Campbell*, 58 F. App'x at 167). "Section 504 requires bad faith or gross misjudgment in the context of education of children with disabilities because to provide otherwise would conflict with the IDEA and with the principles of federalism that underly its implementation." *D.S. ex rel. R.S. v. Knox Cnty.*, No. 3:20-cv-240, 2021 WL 6496726, at *17 (E.D. Tenn. June 21, 2021) (first citing *Reid-Witt ex rel. C.W. v. District of Columbia*, 486 F. Supp. 3d 1, 7–9 (D.D.C. 2020); then citing *I.Z.M. v. Rosemount—Apple Valley—Eagan Pub. Schs.*, 863 F.3d 966, 973 (8th Cir. 2017); and then citing *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 454–55 (5th Cir. 2010)). Where, as here, plaintiffs do not present record evidence showing bad faith or gross misjudgment, their § 504 and Title II claims must fail. *G.C.*, 711 F.3d at 635; *D.S.*, 2021 WL 6496726, at *17.

G.E. and D.B. further rely on *L.H. v. Hamilton County Department of Education*, No. 1:14–cv–126, 2017 WL 4558020 (E.D. Tenn. July 17, 2017), for the proposition that a showing of discriminatory intent is not necessarily required when plaintiffs seek only equitable remedies and not damages for their § 504 and Title II claims. (Doc. No. 24.) The *L.H.* court found that "[t]he Sixth Circuit has yet to speak directly to whether discriminatory intent is required for a plaintiff to obtain an equitable remedy under Title II or Section 504," and relied on *I.L. v. Knox County Board of Education*, 257 F. Supp. 3d 946 (E.D. Tenn. 2017), for the proposition that "[t]here is nothing to indicate that a plaintiff must ever prove intentional discrimination—or deliberate indifference—under Title II and Section 504." 2017 WL 4558020, at *4 (alteration in original) (quoting *I.L.*, 257 F. Supp. 3d at 969). Neither *L.H.* nor *I.L.* addresses the Sixth Circuit's controlling holding in *G.C.*

The plaintiff in *G.C.* sought declaratory and injunctive relief in addition to damages. 711 F.3d at 628. The Sixth Circuit made no distinction between the plaintiff's claims for equitable relief and damages in holding that the plaintiff's § 504 claims failed because the plaintiff had not shown sufficient evidence of bad faith or gross misjudgment. *Id.* at 635. This Court is bound by *G.C.* and therefore declines to follow *L.H.* and *I.L. See D.S.*, 2021 WL 6496726, at *17 (declining to apply *L.H.* and *I.L.* because "[t]he Court is bound by Sixth Circuit precedent, and the Court sees no reason to distinguish or question the continuing validity of *G.C.*"). Because G.E. and S.B. cannot show bad faith or gross misjudgment on the part of WCS, G.E. and S.B.'s § 504 and Title II claims must fail. *G.C.*, 711 F.3d at 635.

## B. G.E. and S.B.'s IDEA Claim

The IDEA provides that a court reviewing an administrative determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)–(iii). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process." *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The amount of weight due to a state agency's findings "will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000). When reviewing procedural issues, "a court should 'strictly review'" whether the school complied with the IDEA's procedural requirements. *Id.* (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*,

197 F.3d 793, 800 (6th Cir. 1999)); *see also Deal*, 392 F.3d at 854 (same). With respect to substantive issues, courts "must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich*, 208 F.3d at 567; *see also Rowley*, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child."). "As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation[,]" while "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant." *Burilovich*, 208 F.3d at 567.

G.E. and S.B. argue that, contrary to the ALJ's findings, G.E. should have received a disability classification of emotional disturbance or other health impairment entitling him to an IEP under the IDEA in the seventh grade for the 2019–2020 school year. (Doc. Nos. 1, 24.) Eligibility classification arguments relate to procedural IDEA violations. *See, e.g.*, *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 789 (6th Cir. 2018) ("Procedural violations generally concern 'the preparation of an IEP,' such as the evaluation, placement, and IEP-formation procedures outlined in [20 U.S.C.] § 1414." (quoting *Rowley*, 458 U.S. at 206)); *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990) (explaining that procedural claims concern "the process by which the IEP is produced, rather than the myriad of technical items that must be included in the written document"). "A finding of procedural violations does not necessarily entitle [plaintiffs] to relief." *Deal*, 392 F.3d at 854. "[R]ather, a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Knable*, 238 F.3d at 765. "Substantive harm

occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process" or "deprive an eligible student of an individualized education program or result in the loss of educational opportunity . . . ." *Id.* at 765–66.

The IDEA requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" 20 U.S.C. § 1412(a)(3)(A). In conducting evaluations, a local educational agency must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent[;]" "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child;" and "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2)(A)–(C); *see also* 34 C.F.R. § 300.304.

Because the IDEA and federal and state regulations set forth procedures for determining a child's eligibility for special education and related services, this Court "'strictly review[s]'" compliance with those procedures. *Burilovich*, 208 F.3d at 566 (quoting *Dong*, 197 F.3d at 800); *Deal*, 392 F.3d at 854 (same).

G.E. and S.B. argue that, based on the record evidence of G.E.'s anxiety and absences, WCS should have classified G.E. with emotional disturbance or other health impairment during the September 2019 IDEA eligibility evaluation. (Doc. No. 24.) WCS responds that the data did not support an emotional disturbance or other health impairment classification at the time because the evidence did not show that anxiety was the primary cause of G.E.'s absences and, in any event,

G.E.'s academic performance was not adversely affected to the extent that he needed special education and related services. (Doc. No. 27.)

The ALJ analyzed G.E.'s IDEA eligibility classification claim as follows:

### Eligibility under the IDEA

WCS conducted thorough evaluations of G.E. in the fall of 2019. The IDEA requires that a school district "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" when conducting an initial evaluation to determine whether a student is a child with a disability. 20 U.S.C. § 1414(b)(2)(A). Furthermore, the district shall "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). Ultimately, a district's evaluation is held to a standard of "reasonableness." *J.S. v. Shoreline Dist.*, 220 F. Supp. 2d 1175 (W.D. Wash. 2002) (quoting *Rowley*, 458 U.S. at 205–07).

Here, the school psychologist, speech language pathologist, and occupational therapist conducted extremely thorough evaluations of G.E. The evaluations were based on and reported the following information and data: review of relevant medical and developmental history, attendance history, school transfers, nurse visits over a three year period, review of his cumulative file for behavioral concerns and grade reports, a private neuropsychological evaluation by Dr. Brittany Paul, history of TCAP (state assessment) scores, recent history of district level assessments and benchmark scores (Achieve3000 and STAR), direct classroom observations by four different observers occurring in multiple settings (social studies, lunch, Warrior period, chemistry, hallway, math), teacher input/interviews (including sixth- and seventh-grade teachers), vision/hearing screenings, student interview, observations during testing sessions, standardized cognitive assessment, standardized achievement assessment, social-emotional and behavioral ratings completed by S.B., G.E., and multiple sixth-grade teachers, executive functioning ratings scales completed by S.B., G.E., and multiple sixth-grade teachers, several rating scales completed by G.E. specifically targeting experiences related to depression and anxiety, autism rating scales completed by S.B. and multiple seventh-grade teachers, review of motor/physical evaluations, visual motor assessment, adaptive rating scales completed by S.B. and multiple sixth-grade teachers, pragmatic language assessment, social skills rating scales completed by multiple sixth- and seventh-grade teachers, and sensory ratings scales completed by S.B., G.E., and G.E.'s seventh-grade teachers. Not only did WCS use a variety

of assessment tools and standards, but WCS's evaluators were extremely thorough in their data collection and presentation of the data to the IEP team.[2]

G.E.'s IEP team, comprised of the parent, a regular education teacher, two special education teachers, interpreters of evaluation results, LEA representatives, school counselor/504 coordinator, and related service providers met on September 18, 2019 to review this evaluation data and determine G.E.'s eligibility under the IDEA. Although WCS also believed that data from a clinical psychological evaluation was needed to obtain information regarding G.E.'s mental health needs and understand differences in diagnosis from different providers and why parental reports of G.E.'s emotional functioning outside of the school environment were drastically different than his functioning in the educational setting, G.E.'s parent refused consent for such evaluation, preventing the team from consideration of such data when determining G.E.'s eligibility. WCS satisfied its obligations by evaluating G.E. and using multiple sources of data across multiple settings to determine whether G.E. was eligible under the IDEA. Any information and data later received from the clinical psychological evaluation was unavailable to the team in September of 2019.

An eligibility determination is "a snapshot of the student's condition at the time of the eligibility determination." *See Lisa M. v. Leander Indp. Sch. Dist.*, 924 F.3d 205, 215 (5th Cir. 2019). "At the eligibility determination moment, therefore, incorporating events that occur afterwards would be incongruous and, indeed, can only invite Monday morning quarterbacking." *Id.* "Subsequent events do not determine ex ante reasonableness in the eligibility context." *Id.* at 214. Thus, the "school district's eligibility determination should be assessed 'at the time of the child's evaluation and not from the perspective of a later time with the benefit of hindsight." *Id.*, *quoting L.J.*, 850 F.3d at 1004; *D.L. v. Clear Creek Indep. Sch. Dist.*, 695 Fed. Appx. 733, 738 (5th Cir. 2017) (citations omitted).[3]

Upon consideration of the available data from the comprehensive evaluation, the IEP team correctly determined G.E. was not eligible as a student with a disability under the IDEA at such time. The IEP team considered three possible areas of eligibility: (1) autism, (2) other health impairment (OHI), and (3) emotional disturbance (ED). To be eligible as a child with a disability under the IDEA, the child must first meet this first prong of eligibility—meeting the State's

---

[2]  "WCS also attempted to obtain additional data from a clinical psychological evaluation, for which S.B. refused to provide consent." (Doc. No. 15-17, PageID# 7218 n.10.)

[3]  "The fact that G.E. was later hospitalized does not make the eligibility determination inappropriate. *See D.L. v. Clear Creek Indep. Sch. Dist.*, 695 Fed. Appx. 733, 738 (5th Cir. 2017) ('That [the student] subsequently spiraled does not undermine that earlier determination.')." (Doc. No. 15-17, PageID# 7219, n.11.)

definition for one of the identified categories of disability. 34 C.F.R. § 300.8. G.E. did not meet this first prong.

The team (including S.B.) agreed that G.E. did not meet the State's criteria for autism. Although S.B. disagreed, the team determined G.E. did not meet the eligibility requirements for an OHI because the data did not support a health problem that caused limited strength, vitality or alertness resulting in impaired organizational or work skills, inability to manage or complete tasks, excessive health related absenteeism, and/or medications that affect cognitive functioning.[4] While the team agreed that G.E. displayed characteristics of anxiety in the home and school setting, the data did not support that his anxiety adversely impacted his educational performance in his learning environment. The IEP team agreed that G.E.'s excessive absenteeism adversely impacted his educational performance; however, the data did not support S.B.'s position that G.E.'s absences were primarily caused by his anxiety. G.E.'s absenteeism adversely impacted his educational performance because he was not receiving the instruction, which would have an impact on nearly every student, rather than because he lacked the ability to receive the instruction. However, even with G.E.'s history of excessive absenteeism, the data showed that G.E. met grade level expectations through the general education supports provided to all students; thus, his absences did not adversely impact his performance such that he needed special education and related services.

Although S.B. disagreed, the team determined that G.E. did not meet the eligibility requirements for ED because data did not support that G.E. met one of the characteristics of an ED to a marked degree and over an extended period of time. In determining the requirements for special education eligibility as a student with an ED, the State of Tennessee requires that the school district obtain a "comprehensive social history/assessment . . . which includes (a) family history, (b) family-social interactions, (c) developmental history, [and] (d) medical history (including mental health)." Furthermore, the evaluation process requires the team to ensure that the evaluation is sensitive to "environmental factors." The definition of ED takes into consideration that situational factors may cause a child to engage in some atypical behaviors or emotions without being eligible as a student with ED by requiring the conditions over a long period of time and to a marked degree.

Here, consideration of all the data, including social-emotional behavior ratings, nurse notes, attendance records, observations, and teacher interviews did not indicate an inability to learn, an inability to build or maintain satisfactory interpersonal relationships, inappropriate types of behavior or feelings, a general pervasive mood of unhappiness or depression, or a tendency to develop physical

---

[4]     "While there was conflicting medical information regarding whether G.E. had ADHD, the team reviewed assessment data related to ADHD like characteristics, which did not support a history of such difficulties to any marked degree in the educational setting." (Doc. No. 15-17, PageID# 7220 n.12.)

symptoms or fears associated with personnel or school problems that occurred to a marked degree, over an extended period of time that adversely impacted G.E.'s educational performance. Over the previous year, the data only indicated a couple of nurse visits related to anxiety, only one visit to the school counselor related to anxiety, only a couple of absences or tardies/early dismissals due to anxiety, and no difficulties (to a marked degree) in the educational environment (almost all of which had occurred within a month of the eligibility determination). Therefore, G.E. did not meet the eligibility requirements for ED and was not eligible as a student with autism, OHI, or ED because he did not meet the requirements of said disabilities. While Dr. Sherwood would later opine that G.E. met the criteria for ED at the time of Dr. Sherwood's assessment in August of 2020, and *perhaps* as early as August 2019, the IEP could not take this information into account at the time of the September 2019 eligibility meeting since Dr. Sherwood's evaluation had not yet been conducted. Further, the team could not know that G.E.'s mental health would decline rapidly in the coming weeks. The team thoroughly and carefully considered all of the information it had available at the time and reached the correct conclusion—that G.E. was not eligible for special education services under the IDEA – based on that information.

Even if G.E. had met the first prong of eligibility—having a disability – there was no adverse impact on his educational performance requiring special education services under the second prong. The fact that a child may have a disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA because the student must also need special education and related services. *A.P.*, 572 F. Supp. 2d at 225. The question of educational need involves consultation of "a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior . . . ." *M.P. BNF K.S*, No. 2:15-CV-233, 2016 WL 632032, at *5 (citing 34 C.F.R. § 300.306(c)(1)(i)). Moreover, the standard is not whether the student could "benefit" from special education services or whether the student could meet his potential with special education services. *M.A.*, 980 F. Supp. 2d at 274–75. Instead, the standard is whether the student needs special education and related services to progress in the general education setting. *Hupp v. Switzerland of Ohio Local Sch. Dist.*, 912 F. Supp. 2d 572, 595 (S.D. Ohio 2012) (finding that the issue before the Court was not whether the student would "benefit" from special education services, but whether the special education services were necessary for the student to receive FAPE). "'Need' should not be measured according to 'whether or not [a student's] potential could be maximized via special education services.'" *See Lisa M.*, at 216, *quoting Alvin Indep. Sch. Dist.*, 503 F.3d at 383; *see L.M.*, 478 F.3d at 314, *quoting Rowley*, 458 U.S. at 201 ("There is no additional requirement, however, 'that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children.'"). Where a student is not *in need* of special education and related services, he cannot be found eligible under the IDEA." *A.P.*, 572 F. Supp. 2d at 225 (citing 20 U.S.C. § 1412(a)(3)(A)).

G.E. did not require special education and related services, as he was making passing grades, was performing successfully on state and district level assessments, and was successful socially and behaviorally in the educational setting. There is no record that supports the contention that G.E. was struggling educationally.

Finally, WCS appropriately considered Dr. Paul's independent evaluation. "Consideration," under the law, does not even require a substantive discussion of the independent evaluation during the IEP meeting. *Mr. P. v. West Hartford Bd. of Educ.*, 885 F.3d 735, 753 (2d Cir. 2018). The IEP team expressly considered Dr. Paul's evaluation report by having the school psychologist thoroughly review it and discussing it during the IEP meeting. The school psychologist references Dr. Paul's evaluation results within WCS's psychoeducational report. Therefore, Petitioners failed to prove that the team did not adequately consider Dr. Paul's evaluation.

(Doc. No. 15-17, PageID# 7217–23.)

IDEA regulations define emotional disturbance and other health impairment as follows:

(4)(i) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

> (C) Inappropriate types of behavior or feelings under normal circumstances.

> (D) A general pervasive mood of unhappiness or depression.

> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

. . .

(9) Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

(ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(4)(i)–(ii), (9)(i)–(ii).

The relevant Tennessee educational regulations provide similar definitions:

(7) "Emotional Disturbance" Emotional disturbance means a condition exhibiting one (1) or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(a) Inability to learn which cannot be explained by intellectual, sensory, or health factors;

(b) Inability to build or maintain satisfactory interpersonal relationships with peers and school personnel;

(c) Inappropriate types of behavior or feelings under normal circumstances;

(d) General pervasive mood of unhappiness or depression;

(e) Tendency to develop physical symptoms or fears associated with personal or school problems.

Emotional Disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance.

. . .

(14) "Other Health Impairment" means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems such as asthma, Attention Deficit Hyperactivity Disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette's Syndrome that adversely affects a child's educational performance.

A child is "Other Health Impaired" who has chronic or acute health problems that require specially designed instruction due to:

(a) Impaired organizational or work skills;

(b) Inability to manage or complete tasks;

(c) Excessive health related absenteeism; or

(d) Medications that affect cognitive functioning.

Tenn. Comp. R. & Regs. 0520-01-09-.02(7), (14) (2019).

Neither the IDEA nor its implementing regulations define the terms "adverse effect on educational performance[.]" *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000); *see also Q.W. ex rel. M.W. v. Bd. of Educ. of Fayette Cnty.*, 630 F. App'x 580, 582 (6th Cir. 2015). While states may choose "to give substance to these terms[,]" *J.D.*, 224 F.3d at 66, the relevant Tennessee educational regulations do not, *see* Tenn. Comp. R. & Regs 0520-01-09-.02 (2019). The Sixth Circuit held in *Q.W.* that, "[a]bsent a contrary directive" in state law, "'educational performance' may encompass more than academic achievement[,]" but "the plain meaning of 'educational performance' suggests school-based evaluation." 630 F. App'x at 582–83. Specifically, under *Q.W.*, educational performance means "the classroom and school experience— to the exclusion of social or behavioral deficits that were not shown to interfere with [a student's] school-based performance." *Id.* at 583.

In support of their argument that G.E. was entitled to an IEP in seventh grade, G.E. and S.B. point to record evidence of S.B.'s testimony regarding G.E.'s obsessive compulsive behaviors at home; the results of a neuropsychological evaluation by Dr. Brittany Paul; testimony from WCS representative Maria Griego that, in the late summer or early fall of 2020, G.E. might have been eligible for an emotional disturbance classification; G.E. and S.B.'s expert psychologist Dr. Charles Ihrig's testimony about G.E.'s anxiety; G.E.'s self reports; testimony from G.E.'s treating psychiatrist Dr. Scott McKay about G.E.'s anxiety; testimony from WCS's expert Dr. Sherwood about his evaluation of G.E. in August 2020; and WCS's provision of specially designed homebound instruction from October 2019 through February 2020 while G.E. was enrolled in the Rogers Behavioral Health partial hospitalization program. (Doc. No. 24.)

None of this evidence demonstrates an adverse impact on G.E.'s educational performance or a need for special education and related services prior to the IEP team meeting on September 18, 2019. The record evidence shows that, even with his history of absences, G.E.'s standardized test scores were at or above grade level, he never failed a class, his overall performance was typical of a child with his IQ, and he was generally successful socially and behaviorally in the educational setting. G.E. and S.B. therefore have not carried their burden to show, by a preponderance of the evidence, the required adverse effect on G.E.'s educational performance to demonstrate that WCS should have classified G.E. with an emotional disturbance or other health impairment during the September 2019 IDEA evaluation. Nor have they carried their burden to show that G.E. needed special education services and related services to progress in the general education setting at the time of that evaluation.

Further, even if G.E. and S.B. had shown that WCS's failure to classify G.E. with emotional disturbance or other health impairment in September 2019 was a procedural violation of the IDEA, they have not shown by a preponderance of the evidence that this failure caused substantive harm. They argue generally that WCS's failure to classify G.E. as eligible for an IEP under the IDEA led to his partial hospitalization, but they have not pointed to any record evidence or legal authority to show a sufficient connection between the lack of an IEP and G.E.'s enrollment in the Rogers Behavioral Health partial hospitalization program.

## III.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that G.E. and S.B.'s motion for judgment on the administrative record (Doc. No. 24) be DENIED and that the ALJ's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt

of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 27th day of February, 2023.

ALISTAIR E. NEWBERN
United States Magistrate Judge