UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| G.E., the student; and S.B., the student's parent and legal guardian, | |
| Plaintiffs, | Case No. 3:21-cv-00702 |
| v. | Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |
| WILLIAMSON COUNTY BOARD OF EDUCATION, | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., District Judge

## REPORT AND RECOMMENDATION

Plaintiffs G.E. and his parent S.B. brought this action against Defendant Williamson County Board of Education, doing business as Williamson County Schools (WCS), under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482, Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act or § 504), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act of 1990 (ADA or Title II), 42 U.S.C. §§ 12131–12165. (Doc. Nos. 1, 44.) The Court has referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 30.)

The Court previously remanded this action to the state administrative law judge (ALJ) for reconsideration of the ALJ's order denying G.E. and S.B.'s claims for relief. (Doc. No. 38.) On remand, the ALJ found that: (1) WCS did not violate the IDEA's and § 504's child-find provisions by failing to identify and evaluate G.E. as a student who might have a disability during his fifth, sixth, and seventh-grade years; (2) G.E. is not eligible for special education services under the

IDEA or § 504; (3) WCS did not deny G.E. access to services in violation of § 504 or Title II; and (4) G.E. and S.B. are not entitled to reimbursement for private school tuition, compensatory education, or other requested relief. (Doc. No. 48-1.)

G.E. and S.B. filed an amended complaint challenging most of the ALJ's reconsidered findings and arguing that, in fifth and sixth grade, WCS failed to reasonably accommodate G.E. in violation of Title II and § 504 and violated § 504's and the IDEA's child-find provisions and that, in seventh grade, WCS further violated the IDEA by finding G.E. ineligible for special education services. (Doc. No. 44.)

G.E. and S.B. have moved for judgment on the administrative record. (Doc. No. 51.) WCS has responded in opposition (Doc. No. 52), and G.E. and S.B. have filed a reply (Doc. No. 53). Considering the parties' arguments and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court deny G.E. and S.B.'s motion.

## I. Background

### A. Legal Background

#### 1. The IDEA

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [(FAPE)] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).[1] The IDEA defines a FAPE as:

special education and related services that—

---

[1] All citations to the U.S. Code and Code of Federal Regulations refer to their current versions. The relevant federal statutes and regulations have not substantively changed since the events at issue in this action occurred.

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9)(A)–(D). To be considered a "child with a disability" under the IDEA, a child must have (1) "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and" (2) must, "by reason thereof, need[ ] special education and related services." *Id.* § 1401(3)(A).

"To meet [the IDEA's] goal, Congress enacted a comprehensive statutory scheme outlining the responsibilities of government agencies and the procedural and substantive guarantees provided to students with disabilities and their families." *Ja. B. ex rel. M.B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 500–01 (6th Cir. 2023). The IDEA requires states that accept federal funding to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A). This "child-find mandate" creates an affirmative obligation of every local educational agency (LEA) to identify and evaluate students who are reasonably suspected of having disabilities and needing special education services. *Ja. B.*, 61 F.4th at 500; *see also Bd. of Educ. of Fayette Cnty. v. L.M. ex rel. T.D.*, 478 F.3d 307, 313 (6th Cir. 2007). The obligation is not limited to children enrolled in the public school system; it extends to "any student residing in the state and all '[c]hildren who are *suspected* of being a child with a disability under [the IDEA] and in need of special education, even though they

are advancing from grade to grade[.]'" *Ja. B.*, 61 F.4th at 501 (first and third alterations in original) (quoting 34 C.F.R. § 300.111(c)(1)); *see also* 20 U.S.C. § 1412.

Before a child may receive special education services, an LEA "shall conduct a full and individual initial evaluation" "to determine whether [the] child is a child with a disability" as defined in 20 U.S.C. § 1401 and "to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(A), (C)(i)(I)–(II). If a student is found to be a child with a disability in need of special education or related services, the LEA is "required to establish an [individualized education program (IEP)]" for the child. *Deal ex rel. Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). "[T]he IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining requirements for IEPs).

A parent with concerns about "any matter relating to" the child's identification, evaluation, and educational placement may file a complaint with the school district and is entitled to an administrative due process hearing on the complaint. 20 U.S.C. §§ 1415(b)(6), (f), (g). Any party aggrieved by the state educational agency's final decision may file a civil action in federal district court. *Id.* § 1415(i)(2)(A).

The IDEA provides that a court reviewing an administrative determination "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)–(iii). "The Supreme Court has construed this provision to mean that an initial reviewing court should make

an independent decision based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process." *McLaughlin ex rel. McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley ex rel. Rowley*, 458 U.S. 176, 206 (1982)). The amount of weight due to a state agency's findings "will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich ex rel. Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000). When reviewing procedural issues, "a court should 'strictly review'" whether the school complied with the IDEA's procedural requirements. *Id.* (quoting *Dong ex rel. Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)); *see also Deal*, 392 F.3d at 854 (same). With respect to substantive issues, courts "must keep in mind that the state and local educational agencies are deemed to possess expertise in education policy and practice." *Burilovich*, 208 F.3d at 567; *see also Rowley*, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child."). "As a result, less weight is due to an agency's determinations on matters for which educational expertise is not relevant, so that a federal court would be just as well suited to evaluate the situation[,]" while "[m]ore weight is due to an agency's determinations on matters for which educational expertise would be relevant." *Burilovich*, 208 F.3d at 567.

### 2. Rehabilitation Act § 504

"While the IDEA guarantees individually tailored special education services to students with disabilities, Section 504 and the ADA prohibit discrimination against individuals with disabilities more broadly." *Knox Cnty. v. M.Q. ex rel. N.Q.*, 62 F.4th 978, 999 (6th Cir. 2023); *see*

*also Fry ex rel. E.F. v. Napoleon Cmty. Schs.*, 580 U.S. 154, 170–71 (2017) ("[T]he IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions.").

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). Section 504's implementing regulations require that students with disabilities have equal access to public schools and that they receive a FAPE regardless of the nature or severity of their disabilities. 34 C.F.R. § 104.33. "Section 504 further requires states to assure 'meaningful access' to their programs by making reasonable accommodations as may be necessary." *M.Q.*, 62 F.4th at 999 (quoting *Doe ex rel. K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1088 (6th Cir. 2023)); *see also E.F.*, 580 U.S. at 160 ("[C]ourts have interpreted § 504 as demanding certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities.'" (quoting *Alexander v. Choate*, 469 U.S. 287, 300 (1985)).

Section 504 applies to all students who have mental or physical impairments, who have a record of physical or mental impairments, or who are regarded as having mental or physical impairments, if the impairments substantially limit one or more major life activities. 34 C.F.R. § 104.3(j). Like the IDEA, § 504's implementing regulations contain a child-find obligation, requiring school districts to identify, locate, and evaluate children with disabilities who need or are believed to need special education or related services. *Id.* §§ 104.32, 104.35.

While "both statutes require the states to provide disabled children with a FAPE and impose child find obligations," "[a] principal difference between section 504 and the IDEA relates to the specific students covered by the statutes." *B.H. ex rel. K.H. v. Portage Pub. Sch. Bd. of*

*Educ.*, No. 1:08-cv-293, 2009 WL 277051, at *6 (W.D. Mich. Feb. 2, 2009); *see also Ja. B.*, 61 F.4th at 496 n.1 (quoting *id.*). Section 504 prohibits discrimination against students with disabilities as defined in 34 C.F.R. § 104.3(j), while the IDEA protects the "subsection" of those students who also "need special education and related services as a result of that disability." *K.H.*, 2009 WL 277051, at *6; *see also* 20 U.S.C. § 1401(3)(A). Accordingly, all students who qualify for special education services under the IDEA are also protected by § 504, but not all students who are considered to have qualifying impairments under § 504 are eligible for special education services under the IDEA. *K.H.*, 2009 WL 277051, at *6.

The Sixth Circuit has held that failure to provide a FAPE in violation of the IDEA is not enough to establish a § 504 claim. *See, e.g.*, *N.L. ex rel. Ms. C. v. Knox Cnty. Schs.*, 315 F.3d 688, 695 (6th Cir. 2003) ("To prove discrimination in the education context, courts have held that something more than a simple failure to provide a free appropriate public education must be shown."). "'[T]he Rehabilitation Act *further requires* that the [plaintiff] must ultimately prove that the defendant's failure to provide [the plaintiff] with a free appropriate public education was *discriminatory*[,]'" which "'requires that either bad faith or gross misjudgment must be shown before a § 504 violation can be made out[.]'" *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013) (second and third alterations in original) (quoting *Campbell ex rel. Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 167 (6th Cir. 2003)).

### 3. The ADA

Enacted in 1990, the ADA provides a "broad mandate" "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674–75 (2001). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Id.* (footnotes omitted).

7

As relevant here, Title II "cover[s] both adults and children with disabilities, in both public schools and other settings." *E.F.*, 580 U.S. at 159. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "A regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination.'" *E.F.*, 580 U.S. at 159–60 (quoting 28 C.F.R. § 35.130(b)(7)); *see also M.Q.*, 62 F.4th at 999–1000 ("Moreover, the ADA requires public entities to make reasonable modifications to their policies, practices, or procedures to avoid discrimination on the basis of disability."). The Sixth Circuit therefore "generally recognize[s] two methods for proving discrimination [under Title II]: intentional discrimination and failure to make reasonable accommodation." *Marble v. Tennessee*, 767 F. App'x 647, 651 (6th Cir. 2019) (*Marble II*) (citing *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997)).

Courts generally analyze "claims under Title II of the ADA and the Rehabilitation Act together because the language of the two statutes materially differs in only two ways." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023). "First, the Rehabilitation Act applies only to federally funded, rather than 'public' entities." *Id.* at 324. "Second, the Rehabilitation Act requires that discrimination occur 'solely by reason of' the plaintiff's disability, whereas the ADA requires that it occur 'because of' the plaintiff's disability[,] . . . [which is a] less stringent causation standard . . . ." *Id.*; *cf. S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (analyzing "ADA and § 504 claims together" where "[n]either of these differences between the ADA and § 504 is at issue").

### B.   Factual Background

#### 1.   Fifth Grade (2017–2018)

G.E. attended WCS's Crockett Elementary School for fifth grade during the 2017–2018 school year. (Doc. No. 15-5.) Documents in the administrative record relevant to this time period include school records; documents and testimony regarding S.B.'s communications with Crockett Elementary School personnel about G.E.; and G.E.'s medical records from Vanderbilt Behavioral Health.

School records show that S.B. completed a WCS "Student Health History" form for G.E. in August 2017. (Doc. No. 15-17, PageID# 6876.) In a section of the form marked "Serious Health Concerns/Medical Conditions[,]" S.B. wrote that G.E. "has anxiety[.]" (*Id.*) In other sections, she indicated that G.E. did not take any prescription medications at home and would not require "[e]mergency" or "[o]ther [m]edications" at school. (*Id.*)

On November 1, 2017, G.E.'s English Language Arts teacher Jessica Konemann emailed S.B. asking "to set up a meeting with [S.B.] and [G.E.]'s teachers to discuss a few things with [S.B.]." (Doc. No. 15-16, PageID# 6833.) S.B. responded the same day, providing her availability for a meeting the following week, stating that G.E. "has a doctors appointment followed by therapy at Vanderbilt on Tuesday at 9am." (*Id.*) She asked Konemann to "let [her] know w[ ]hat [the meeting] is regarding" and stated that G.E. had "been trying very hard, but [was] having emotional issues/anxiety and trouble with a child on the bus." (*Id.*) Konemann responded that, "[s]ince we didn't get a chance to meet during conferences, we would like to discuss any of your concerns . . . [and] would also like to discuss [G.E.'s] academics and his progress in his 5th grade year." (*Id.*) Konemann and S.B. agreed to meet on Monday, November 6, 2017. (Doc. No. 15-16.) S.B. testified that the meeting took place as scheduled with S.B., Konemann, G.E.'s social studies teacher Rachel Smith, and G.E.'s math teacher Lesley Ford in attendance. (Doc. No. 15-10.) S.B.

testified that they discussed "G.E.'s attendance, G.E. struggling in his classes, G.E. getting behind, and his constant struggle to keep up with the math assignments." (*Id.* at PageID# 3989.) She further testified that she "let them know that [G.E.] had been struggling . . . , he was having some anxiety, and feeling overwhelmed and he was just having a hard time." (*Id.* at PageID# 3990.) S.B. testified that Konemann, Smith, and Ford "indicated to [her] that [she] needed to get [G.E.] to school." (*Id.* at PageID# 3991.)

Records from Vanderbilt Behavioral Health show that Vanderbilt Mental Health Clinician Anthony Clausi, LPC, saw G.E. for an initial consultation on November 7, 2017. (Doc. No. 15-14.) Clausi diagnosed G.E. with generalized anxiety disorder, panic attacks, and depression. (*Id.*) Clausi recommended individual therapy and family therapy and referred G.E. to another provider for medication management. (*Id.*) G.E. saw Vanderbilt Mental Health Clinician Heather N. Sturgeon, APRN, for an office visit on December 15, 2017.[2] (*Id.*) Sturgeon prescribed G.E. Prozac and recommended that he attend individual and family therapy with Clausi two to four times per month. (*Id.*) She also recommended an occupational therapy evaluation to address G.E.'s sensory issues. (*Id.*) According to G.E.'s Vanderbilt Behavioral Health records, G.E. was scheduled for "numerous appointments with [Clausi]" between November 2017 and August 2018 "and no-showed all of them." (*Id.* at PageID# 5845.) There is no indication in the administrative record that G.E. was evaluated for occupational therapy in fifth grade.

The record includes notes and emails written by S.B. between September 2017 and February 2018 attributing several of G.E.'s absences to physical illnesses like strep throat and flu. For example, S.B. signed a handwritten note stating: "Please excuse [G.E.] for being absent 8-30-

---

[2]     G.E.'s Vanderbilt Behavioral Health records later identify Sturgeon as an ACNP, or acute care nurse practitioner. (Doc. No. 15-14.)

17, 8-31[-]17 and 9-1-17. He had a stomach virus that we later found out was strep." (Doc. No. 15-17, PageID# 7001.) On December 18, 2017, S.B. emailed Konemann that "[G.E.] has been really sick over the weekend and we have been at Vanderbilt today because he is having trouble breathing along with having strep again." (Doc. No. 15-16, PageID# 6856.) On February 12, 14, and 15, 2018, S.B. sent emails to Smith, Ford, Konemann, and Randolph explaining that G.E. had "both A & B flu"; was "running a fever of 101 with meds"; was "starting a steroid to help with breathing"; and would "be out most of the week." (Doc. No. 15-13, PageID# 5465, 5494; Doc. No. 15-17, PageID# 6861.)

On March 7, 2018, G.E. became upset with another student who was teasing him at school and punched a wall. (Doc. Nos. 15-12, 15-13.) His teacher sent him to school nurse Barbara Thompson to check for injuries, and Thompson later sent G.E. to speak to school counselor Jennifer Randolph. (Doc. Nos. 15-12, 15-13.) That evening, S.B. emailed Randolph, stating:

> [G.E.] told me about what happened today. I wanted to inform you that he is NOT being abused, nor has he ever been. He is however, under psychiatric care and has been on medication for almost 2 months. He is about to begin occupational therapy to help learn coping skills for living with sensory overload issues and talk therapy to help him with anxiety. He has struggled with depression/anxiety and low self esteem for a while. We wanted to avoid medication but could no longer do so. His doctor is still adjusting his dose to get the right fit for [G.E.]. He is showing improvement but as you know, this process takes time.

(Doc. No. 15-13, PageID# 5460.) Randolph responded the next day, thanking S.B. for her email and stating that Randolph "had no idea about all of that." (*Id.* at PageID# 5462.) Randolph also described her conversations with G.E. and then stated:

> Teachers have been very concerned with how much [G.E.] has been absent this year. After looking into his attendance, he has missed an unusual amount of school and that was before he got hit with the awful flu. Being a new student, going through all that you just shared and then missing so much school is a lot to manage. Please let me know how I can support him on this end. I want to help out however I can.

(*Id.*) Randolph testified that she probably shared the information S.B. provided to her about G.E.'s mental health conditions and treatment with G.E.'s teachers, but she could not "say for sure . . . ." (Doc. No. 15-8, PageID# 3197.)

S.B. and G.E. met with Crockett Elementary School Principal Bronwyn Rector on March 8, 2018, after S.B. signed G.E. into school that morning. (Doc. Nos. 15-10, 15-12, 15-17.) Rector testified that she "initiated that conversation because [she] just wanted to discuss attendance." (Doc. No. 15-10, PageID# 4274.) Rector testified that S.B. told her that G.E.'s absences were primarily due to medical appointments and illnesses like strep throat and the flu. (Doc. No. 15-10.) S.B. recalled the meeting differently. She testified that she "walked in[to] the principal's office and asked to speak with Ms. Rector" because "G.E. was being bullied on the bus" and S.B. wanted "G.E. to tell [Rector] what was happening" so that Rector "could handle it . . . ." (Doc. No. 15-12, PageID# 4969, 4970.) S.B. testified that she, G.E., and Rector discussed the fact that another student was bullying G.E. about his clothes because, due to "sensory issues", G.E. sometimes wore the same clothes to school for multiple days. (*Id.* at PageID# 4970.) Rector's notes from this meeting reflect that G.E. "didn't want to come to school" but "chose to go to class [at] 10:45[a.m.]"; was "struggling w[ith] anx[iety], dep[ression], [and] self-image"; was "seeing [a] psych[ologist] [at] Vanderbilt"; "started med[ications] in Jan[uary]" and sometimes experienced "sensory overload[.]" (Doc. No. 15-17, PageID# 6890.) The notes also reflect that G.E. saw doctors in October, November, and December, and had "A [and] B flu" in February. (*Id.*)

On March 22, 2018, Randolph submitted a social work referral for G.E. based on his accumulated absences. (Doc. No. 15-13.) In a section of the referral form asking Randolph to explain her reasons for referring G.E., Randolph wrote:

> [G.E.] has missed 30 days of school and has early dismissals and tardies on top of that. Teachers are concerned about lack of contact from mom. Please call me to

discuss further, but do go ahead and try to reach out to mom to ask if any assistance could help get him to school.

(*Id.* at PageID# 5458.) Randolph did not mention what S.B. told her two weeks before about G.E.'s struggles with anxiety and depression. WCS Social Worker Sherry Stewart completed a "Social Work Record of Intervention" form based on Randolph's referral. (*Id.* at PageID# 5459.) The record of intervention lists the date of referral as March 23, 2018. (Doc. No. 15-13.) In a section of the form titled "Intervention[,]" Stewart checked blanks next to "Staff consultation/Team Meeting" and "Counseling/consultation with parents/family[.]" (*Id.* at PageID# 5459.) In a section titled "Outcome/Recommendations[,]" Stewart wrote "suggest court intervention[.]" (*Id.*) Stewart signed the record of intervention in "May 2018[.]" (*Id.*)

Medical records show that Sturgeon saw G.E. for an office visit on March 30, 2018, and increased his Prozac dose from 10 mg to 20 mg. (Doc. No. 15-14.) Sturgeon also "[e]ncouraged" S.B "to schedule an app[ointment]" with Clausi for therapy "when able . . . ." (*Id.* at PageID# 5883.) A few days later, on the morning of April 2, 2018, S.B. emailed Smith about the effects of G.E.'s medication increase:

> [G.E.] had a medication increase and it really made sleeping last night difficult for him. He kept waking up with anxiety, if he's really tired and emotional today, please understand. I left a message for his doctor this morning to let her know that regardless of the time of day he takes it, he is having difficulty. Praying we get this sorted out for him.

(Doc. No. 15-17, PageID# 6869.) Smith responded less than an hour later, thanking S.B. for letting her know and promising to "keep an extra eye on [G.E.] today . . . ." (*Id.*) That afternoon, G.E. fell in a hallway at school, hit his head on a wall, and lost consciousness. (Doc. Nos. 15-10, 15-12.) Thompson evaluated G.E. and called S.B. to tell her what happened and ask her to pick G.E. up early from school. (Doc. Nos. 15-10, 15-12.) S.B. told Thompson that G.E. had been experiencing side effects from his increased Prozac dose and that he "was up [until] 2 am with anxiety last

[night.]" (Doc. No. 15-12, PageID# 5128.) Medical records show that Sturgeon decreased G.E.'s Prozac dose to 10 mg per day at S.B.'s request. (Doc. No. 15-14.)

G.E. completed the 2017–2018 year with passing grades, receiving As in English and Science, Bs in Reading and Geography, and a C in Math. (Doc. No. 15-12.) School attendance records show that G.E. was absent a total of forty-one days and tardy seventeen times. (Doc. No. 15-17.) Twenty of G.E.'s absences were marked excused by a note from S.B. or from a doctor's office, while twenty-one of the absences were marked unexcused. (*Id.*) Only two of G.E.'s seventeen tardies were marked as excused. (*Id.*)

### 2. Sixth Grade (2018–2019)

G.E. attended WCS's Woodland Middle School for sixth grade during the 2018–2019 school year. Although G.E. and S.B.'s home was not zoned for Woodland Middle School, G.E. was able to attend the school without submitting an out-of-zone request due to a clerical error. Documents in the administrative record relevant to this period include school records; documents and testimony regarding Woodland Middle School personnel's communications with each other and S.B. about G.E.; and G.E.'s medical records from Lifecare Family Services (Lifecare).

G.E.'s school records include a health history form that S.B. submitted for the 2018–2019 school year stating that G.E.'s "[s]erious [h]ealth [c]oncerns/[m]edical [c]onditions" included "[d]epression/[a]nxiety" and that his "prescription medications taken at home" included "Prozac[.]" (Doc. No. 15-13, PageID# 5364.)

G.E.'s medical records show that, on August 14, 2018, S.B. brought G.E. to Lifecare for an intake appointment, depression screening, and diagnostic interview. (Doc. No. 15-14.) S.B. and G.E. reported that G.E. had a history of generalized anxiety disorder and mild major depressive disorder with "symptoms of sleep disturbance, restlessness, edgy, worry, worry related to caregiver, irritability, fatigue and tiredness, some loss of pleasure, indecisive, worthless, hopeless,

some withdrawal, and many days depressed." (*Id.* at PageID# 5756.) Asked if G.E. had "[a]ttendance [i]ssues" at school, S.B. and G.E. responded "[y]es" and stated that his attendance issues were "due to MI symptoms[.]"[3] (*Id.* at PageID# 5748.) S.B. and G.E. stated that G.E. did not have "[i]n-[s]chool [b]ehavior [p]roblems[.]" (*Id.*) Records from the appointment show that Lifecare providers diagnosed G.E. with generalized anxiety disorder and major depressive disorder, recurrent, mild, and recommended individual therapy once or twice per month and psychiatric medication management. (Doc. No. 15-14.)

G.E. and S.B. attended a therapy session with Lifecare provider Wesley Hinton on September 4, 2018. (*Id.*) Hinton's notes describe the session as follows:

> [G.E.] and [S.B.] presented for [G.E.'s] 1st session since intake. [S.B.] reported [G.E.'s] frustrated moods. [G.E.] reported frustration and irritation. [Hinton], [G.E.,] and [S.B.] processed through [G.E's] symptoms (some worry, nervousness, quietness and down and moody), some [history], and his R&W and crisis safety plans. [S.B.] refuted [G.E.'s] defiance and preferred to identify this behavior as "he's just frustrated, he's having a bad day because he doesn't want to go to football practice." [G.E.] reported (in private) that he is concerned about football related injuries and his interest is changing due to that; and that his mixed/fluctuating moods are related to being understood/getting his way. He added that he is not in favor of having to attend therapy. He reported school, friends, sports and [S.B.] as his coping methods. He was encouraged to consider his symptoms, his goals and methods to cope. [Hinton] used data gathering, redirection, relationship building and CBT/stress [management] methods.

(*Id.* at PageID# 5784.) S.B. testified that, after this appointment, Hinton "had a stroke and passed away suddenly[.]" (Doc. No. 15-9, Page# 3918; *see also* Doc. No. 15-10, PageID# 4143 (identifying "Hinton" as "the provider that . . . had a stroke and passed away")).

In October 2018, near the end of the first nine-week grading period of the school year, G.E.'s social studies teacher Katherine Fall emailed other teachers about an upcoming parent-

---

[3]     S.B. and G.E. argue that "MI" is "[a]pparently a reference to 'mental illness.'" (Doc. No. 51, PageID# 7885 n.13.)

teacher conference day and asked the teachers to compile a list of students whose parents they would like to see for conferences. (Doc. No. 15-13.) Fall wrote that G.E. was "on [her] radar" for a parent-teacher conference, and science teacher Megan McCullough agreed. (*Id.* at PageID# 5371.) Fall testified that her "concern for G.E. was strictly about his absences," which were "starting to impact his ability to do well on tests, because he was missing class instruction" and "was not in class on a consistent basis." (Doc. No. 15-7, PageID# 2950, 2951.) On the same day, Fall emailed guidance counselor Deana Stepanic and asked her to "check in with [G.E.] at some point in the next week or so." (Doc. No. 15-13, PageID# 5365.) Fall told Stepanic that G.E. was "struggling with test taking skills"; that she was "concerned that he could slip through the cracks"; and that she and G.E.'s other teachers were "going to schedule a conference with his mom on Nov[ember] 6th." (*Id.*) Stepanic testified that she met with G.E. twice during his sixth-grade year for academic check ins on December 1, 2018, and April 29, 2019, and that she and G.E. "created a plan for him . . . to get caught up" from being absent and missing assignments. (Doc. No. 15-10, PageID# 4437.)

Fall emailed S.B. on October 28, 2018, "to request a conference with [her] to discuss some ways that we can help [G.E.]" and asked S.B. if she was available to meet on Tuesday, November 6th. (Doc. No. 15-13, PageID# 5362.) S.B. responded on November 2, 2018, stating that she "would like to meet and discuss [G.E.] but unfortunately [ ] [could] not meet on Nov[ember] 6th." (*Id.* at PageID# 5363.) S.B. asked to meet another time or schedule a phone conference. (Doc. No. 15-13.) Fall responded four days later, asking S.B. to let her know if S.B. could "do a phone conference on Thursday, November 8th at 1:15[.]" (*Id.* at PageID# 5367.) S.B. did not respond before that time, and Fall did not call. S.B. emailed Fall after 3:00pm on November 8th,

apologizing and stating that she "was wondering why [she] hadn't gotten a call then rechecked the email and noticed [that] [she] didn't respond" "to confirm[ ] that 1:15 was a good time . . . ." (*Id.*)

Fall emailed S.B. again on November 16, 2018, to "check[ ] on [G.E.]" who had been absent. (Doc. No. 15-17, PageID# 6874.) Fall said they would "schedule a phone conference with [S.B.] just to touch base" after Thanksgiving, apologized "for the confusion surrounding [their] last phone conference[,]" and mentioned that she and G.E.'s other teachers were "seeing improvements in his test scores in some of his classes." (*Id.*) S.B. responded the same day, telling Fall that G.E. had "been sick from Strep and a virus." (*Id.*)

G.E.'s math teacher Brian Riefenberg emailed with S.B. several times during the school year asking for S.B.'s help encouraging G.E. to complete missing assignments and take or retake quizzes. (Doc. Nos. 15-13, 15-14.) Some of the emails between Riefenberg and S.B. discuss G.E.'s absences from school. (Doc. No. 15-13.) Riefenberg also recommended a tutoring service for G.E. at S.B.'s request. (*Id.*) Riefenberg testified that he provided G.E. with extra help outside of math class several times and that these extra sessions were "very beneficial and very helpful to [G.E.] . . . when he would miss large amounts of time" because G.E. "was able to pick up the necessary information" and showed "resiliency[.]" (Doc. No. 15-6, PageID# 2643.) Riefenberg further testified that G.E. improved at turning in missed work after November 1, 2018. (Doc. No. 15-6.)

S.B. emailed G.E.'s English language arts teacher Jordan Gilliland on May 18, 2019. (Doc. No. 15-13.) She stated that G.E. was concerned about passing Gilliland's class and was working on completing his assignments. (*Id.*) S.B. also mentioned that G.E. had "been sick often with headaches, his brother has had mono and [S.B. was] afraid [G.E.] [m]ay have it too." (*Id.* at PageID# 5360.) Gilliland responded that "[w]e should be able to get [G.E.'s] grade back up and passing . . . [a]s long as he completes everything he's missing, he should be fine." (*Id.* at

PageID# 5359.) Gilliland offered to "work with [G.E.]" and told S.B. that G.E. was "welcome in [Gilliland's] room during 6th period tomorrow if he wants some extra time to get caught up." (*Id.*) Gilliland testified that G.E. was frequently absent or tardy and that Gilliland was aware "that G.E. had some anxiety" based on her review of his school records, but she did not know that he had been diagnosed with depression or that he was frequently absent during fifth grade. (Doc. No. 15-7, PageID# 2867.)

S.B. also emailed McCullough on May 18, 2019, stating that G.E. was "very concerned with his grade and not passing [McCullough's] class and having to repeat 6th grade." (Doc. No. 15-13, PageID# 5372.) S.B. stated that G.E. had "been sick a lot with headaches" and had the same symptoms as his brother who tested positive for mono. (*Id.*) McCullough responded two days later, stating that she and G.E. "had several conversations about his missing assignments[,]" describing G.E.'s progress completing those assignments, and explaining his options for earning extra credit. (*Id.* at PageID# 5373.)

G.E. passed sixth grade with Bs in science and social studies and Cs in math and English language arts. (Doc. No. 15-17.) He was absent eighteen times and tardy thirty-six times. (*Id.*)

Toward the end of G.E.'s sixth-grade year, S.B. submitted an out-of-zone request for G.E. to return to Woodland Middle School for seventh grade. WCS denied the request, and S.B. appealed with assistance from an attorney. On June 10, 2019, S.B.'s attorney sent a letter to two WCS school board members informing them that G.E. "was diagnosed with an anxiety disorder" in April 2016, that his condition "worsened[,]" and that, "on August 14, 2018, [G.E.] was diagnosed with generalized anxiety disorder, mild major depressive disorder, recurrent episode[,] and oppositional defiant disorder." (Doc. No. 15-14, PageID# 5650, ¶ 1.) S.B.'s attorney attached an excerpt from G.E.'s Lifecare medical records showing G.E.'s diagnosis from his August 14,

2018 appointment with Hinton. (Doc. No. 15-14.) In the same letter, S.B.'s attorney asserted that G.E. "thrived" during sixth grade at Woodland, "performing at a high level[,]" engaging in "appropriate peer interaction[,] and [forming] relationships" with students and staff. (*Id.* at PageID# 5650, ¶ 1.) WCS denied the appeal (Doc. No. 15-14), and S.B. and G.E. filed a due process complaint asserting violations of the IDEA and § 504 (Doc. No. 15-1). Among other things, S.B. and G.E.'s complaint alleged that G.E. "struggle[d] with anxiety which cause[d] him to frequently miss school." (Doc. No. 15-1, PageID# 189, ¶ 6.)

Based on S.B. and G.E.'s due process complaint, WCS requested S.B.'s consent for WCS to evaluate G.E. for eligibility under the IDEA and § 504 and for WCS's expert Dr. Vance Sherwood to conduct a clinical psychological evaluation of G.E. S.B. agreed to allow WCS to conduct an initial evaluation of G.E.'s eligibility, but refused to allow Sherwood's examination. WCS ultimately approved G.E.'s out-of-zone request to return to Woodland Middle School based on S.B.'s representation that they intended to lease a home within the Woodland zone during G.E.'s seventh-grade school year.

### 3.    Seventh Grade (2019–2020)

G.E. attended Woodland Middle School for seventh grade during the 2019–2020 school year. There is no dispute that G.E.'s teachers and other WCS personnel noticed a change in G.E.'s mental health and in-school behavior during the beginning of seventh grade. WCS continued the IDEA eligibility evaluation process by convening an IEP meeting on September 18, 2019, to determine G.E.'s IDEA eligibility. (Doc. No. 15-17.) S.B. attended the meeting and, according to the administrative record:

> The team reviewed the district's evaluation results, which included review of educational records, developmental/medical records (provided by the parent), parent interview, student interview, teacher interviews (6th and 7th grade), vision/hearing results, classroom and other observations in the educational setting, review of benchmark and state assessment results, grades, attendance, nurse visits,

standardized achievement assessment, cognitive assessment, visual perception assessment, social-emotional behavior ratings, autism ratings, anxiety and depression ratings, adaptive ratings, pragmatic assessment, social skills ratings, occupational therapy/sensory ratings, and district email correspondence regarding [G.E.]. The team also considered the private neuropsychology evaluation conducted by Dr. Brittany Paul, and [G.E.'s] diagnoses from medical and mental health providers. At the eligibility meeting, the team also considered and discussed the parent's input and concerns (including questions raised by the parent, her husband, and her attorney).

(*Id.* at PageID# 6947, ¶ 5.) The IEP team and S.B. agreed that G.E. did not meet the IDEA criteria for autism. (Doc. No. 15-17.) The IEP team determined that G.E. also did not meet the IDEA criteria for emotional disturbance (ED) or other health impairment (OHI), but S.B. disagreed. (*Id.*) S.B. argued that G.E. qualified for emotional disturbance and/or other health impairment classifications because G.E.'s anxiety caused excessive absences that adversely affected his educational performance. (*Id.*) The IEP team found that, while G.E. displayed some characteristics of anxiety at home and at school, the data did not support finding that G.E.'s anxiety was the primary cause of his absences or that his anxiety otherwise adversely affected his educational performance. (*Id.*)

The ALJ found that "[a]fter a 3-and-a-half-hour IDEA eligibility meeting, the parties had intended to discuss eligibility under Section 504. However, [S.B.] requested that the Section 504 portion of the meeting be rescheduled due to scheduling conflicts . . . [and] no Section 504 eligibility meeting ever occurred." (Doc. No. 48-1, PageID# 7773 n.9.) WCS Executive Director for Student Support Services Maria Griego testified that WCS offered to hold a § 504 meeting on several dates in September and October 2019, but that S.B. either did "not attend[ ] the meeting or declin[ed] the meeting." (Doc. No. 15-11, PageID# 4525.)

S.B. placed G.E. in the Rogers Behavioral Health OCD/Anxiety Partial Hospitalization Program from October 2019 through February 2020, during which time WCS provided G.E. homebound instruction. Griego testified that WCS again offered to hold a § 504 meeting for G.E.

after his release from Rogers, but S.B. declined. (Doc. No. 15-11.) WCS closed all its schools in March 2020 due to the COVID-19 pandemic, and the schools remained closed for the rest of that academic year.

WCS approved G.E.'s out-of-zone request to attend Woodland Middle School for eighth grade during the 2020–2021 school year. In August 2020, the ALJ ordered S.B. to allow Sherwood to conduct a clinical evaluation of G.E. (Doc. No. 15-2.) The evaluation took place shortly thereafter and, following the evaluation, WCS proposed holding another IDEA eligibility meeting for G.E. in September 2020. G.E. and S.B. refused to participate in that meeting and instead informed WCS that G.E. would attend private school at Currey Ingram Academy (CIA).

## C.    Procedural History

In July 2019, after WCS initially denied G.E.'s out-of-zone request for seventh grade, G.E. and S.B. filed a due process complaint alleging that G.E.'s absences triggered WCS's child-find obligations under § 504 and the IDEA and that WCS violated those statutes by failing to evaluate G.E. earlier. (Doc. No. 15-1.) G.E. and S.B. filed an amended due process complaint in April 2020 adding claims under Title II. (*Id.*)

An ALJ in the Tennessee Department of Education's Division of Special Education presided over a due process hearing held on January 11–15, February 2–4, April 15, 16, and 23, and May 10, 2021. (Doc. Nos. 15-5–15-12.) G.E. and S.B. were represented by counsel, and more than twenty witnesses testified. The ALJ issued a final written decision on July 12, 2021, denying all of G.E. and S.B.'s claims. (Doc. No. 15-17.)

G.E. and S.B. initiated this action by filing a complaint under 20 U.S.C. § 1415(i)(2), alleging that WCS violated the IDEA, § 504, and Title II, and seeking monetary damages and equitable relief. (Doc. No. 1.) WCS filed an answer to the complaint (Doc. No. 13) and the sealed

administrative record (Doc. Nos. 15–15-17).[4] G.E. and S.B. then moved for judgment on the administrative record, arguing that WCS violated § 504's child-find provision for G.E.'s fifth-grade and sixth-grade years and violated the IDEA by finding G.E. ineligible for special education services in his seventh-grade year. (Doc. No. 24.) G.E. and S.B. further argued that "the ALJ copied verbatim, from a Word document, its Final Order from [WCS's] own suggested findings." (*Id.* at PageID# 7346.) WCS responded in opposition to G.E. and S.B.'s motion for judgment on the record (Doc. No. 27), and G.E. and S.B. filed a reply (Doc. No. 28). The Court referred the action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 30.)

The Magistrate Judge entered a report and recommendation recommending that the Court deny G.E. and S.B.'s motion for judgment on the administrative record and affirm the ALJ's decision. (Doc. No. 31.) G.E. and S.B. filed objections to the report and recommendation (Doc. No. 32), WCS responded to those objections (Doc. No. 33), and G.E. and S.B. filed a reply with the Court's leave (Doc. Nos. 34, 36, 37). On March 31, 2023, the Court issued an order finding that the ALJ's "findings of fact and [ ] conclusions of law . . . were lifted almost verbatim from [WCS's] filings" and that "the vast majority of the language, and, accordingly, the legal analysis was defense counsel's." (Doc. No. 38, PageID# 7572.) The Court denied without prejudice G.E. and S.B.'s motion for judgment on the administrative record; remanded G.E. and S.B.'s claims to the ALJ for reconsideration; and administratively stayed this action pending the ALJ's reconsidered decision. (Doc. No. 38.)

---

[4]     G.E. and S.B. filed a motion to supplement the administrative record (Doc. No. 19), which the Court denied without prejudice (Doc. No. 22).

The ALJ issued a "Final Order on Remand" on May 31, 2023. (Doc. No. 48-1, PageID# 7752.) The ALJ's final order includes the following enumerated conclusions of law:

> 1. The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2017–2018 school year.
>
> 2. The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2018–2019 school year.
>
> 3. The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2019–2020 school year.
>
> 4. The Petitioners have failed to meet their burden of proof that G.E. was eligible for special education services under the IDEA during the 2017–2018, 2018–2019, or 2019–2020[ ] school years.
>
> 5. The Petitioners have failed to meet their burden of proof that G.E. was denied access to programs or services in violation of the Americans with Disabilities Act and/or Section 504 of the Rehabilitation Act.
>
> 6. The Petitioners have failed to meet their burden of proof that G.E. is entitled to compensatory education, reimbursement for placement at Currey Ingram Academy, or any other requested relief.
>
> 7. WCS is the prevailing party on all claims.

(*Id.* at PageID# 7794–95.)

The parties filed a joint motion to lift the administrative stay in this action on June 26, 2023 (Doc. No. 41), and the Court granted the joint motion (Doc. No. 42). G.E. and S.B. filed an amended complaint alleging that WCS failed to reasonably accommodate G.E. during his fifth-grade and sixth-grade years in violation of Title II of the ADA and § 504; violated § 504's and the IDEA's child-find provisions for G.E.'s fifth-grade and sixth-grade years; and further violated the IDEA by finding G.E. ineligible for special education services in his seventh-grade year. (Doc. No. 44.)

G.E. and S.B .filed a motion for judgment on the administrative record appealing the ALJ's final order on remand and arguing that they are entitled to judgment on their claims under the

ADA, § 504, and the IDEA.[5] (Doc. No. 51.) WCS responded in opposition to G.E. and S.B.'s motion for judgment on the administrative record (Doc. No. 52), and G.E. and S.B. filed a reply (Doc. No. 53). The Court referred G.E. and S.B.'s motion to the Magistrate Judge. (Doc. No. 55.)

## II.    Analysis

G.E. and S.B.'s claims and arguments on appeal from remand differ from their original claims and arguments. G.E. and S.B. now argue that WCS discriminated against G.E. in violation of the ADA and § 504 in fifth grade and sixth grade by failing to evaluate him to determine if he was disabled and in need of reasonable accommodations under these statutes. (Doc. Nos. 44, 51.) G.E. and S.B. argue that the same evidence underlying their reasonable accommodation claims also supports finding that WCS violated the child-find provisions of § 504 and the IDEA in G.E.'s fifth-grade and sixth-grade years. (Doc. Nos. 44, 51.) Finally, G.E. and S.B. argue that, in seventh grade, WCS violated the IDEA by finding G.E. ineligible for special education services during the September 2019 eligibility meeting and by failing to determine that G.E. was eligible for special education services under the IDEA between October 2019 and August 2020. (*Id.*)

### A.    Fifth-Grade and Sixth-Grade Claims

#### 1.    Reasonable Accommodation Claims Under the ADA and the Rehabilitation Act

The ADA and the Rehabilitation Act require covered entities to make reasonable modifications to their programs, policies, and practices "to assure 'meaningful access'" and "to avoid discrimination on the basis of disability." *M.Q.*, 62 F.4th at 999, 1000 (quoting *K.M.*, 56 F.4th at 1088). "To prevail in a failure-to-accommodate claim, the plaintiff must show that the

---

[5]    G.E. and S.B. filed a motion for judgment on the administrative record (Doc. No. 50) and, later the same day, filed a corrected motion for judgment on the administrative record (Doc. No. 51). The Court denied the earlier-filed motion as moot. (Doc. No. 54.)

defendant reasonably could have accommodated his disability but refused to do so, and that this failure to accommodate 'imped[ed] [his] ability to participate in, or benefit from, the subject program[.]'" *Id.* at 1000 (first and second alteration in original) (first citing *Keller v. Chippewa Cnty. Mich. Bd. of Comm'rs*, 860 F. App'x 381, 385 (6th Cir. 2021); and then quoting *Campbell*, 58 F. App'x at 166). Typically, "[t]he plaintiff must establish both that his preferred accommodation was reasonable, *and* that the accommodation provided to him was unreasonable." *Id.* (citing *K.M.*, 56 F.4th at 1088).

Covered entities under the ADA and the Rehabilitation Act are "generally not liable for failing to make reasonable accommodation if the plaintiff did not request accommodation or otherwise alert the covered entity to the need for accommodation." *Marble II*, 767 F. App'x at 652; *see Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998). Thus, to prevail on a failure-to-accommodate claim under the ADA or the Rehabilitation Act, "a plaintiff must generally establish as a first step that he requested a reasonable accommodation." *Marble v. Tennessee*, Case No. 3:15-cv-00508, 2018 WL 2739372, at *11 (M.D. Tenn. June 7, 2018) (*Marble I*), *aff'd, Marble II*, 767 F. App'x at 654–55; *see also Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 837 (6th Cir. 2020) ("[W]e previously have held that a 'College was not obligated to provide accommodation until plaintiff had . . . requested specific accommodation.'" (second alteration in original) (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998))); *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) ("A publicly funded university is not required to provide accommodation to a student under the ADA . . . until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation." (quoting *Carten v. Kent State Univ.*, 78 F. App'x 499, 500–01 (6th Cir. 2003))); *Johnson v. Wash. Cnty. Career Ctr.*, 470 F. App'x 433, 437 (6th Cir. 2012) ("A publicly

25

funded academic institution is not obligated to accommodate under the ADA until receiving a proper diagnosis and request for specific accommodation." (citing *Kaltenberger*, 162 F.3d at 437)); *Allen v. Middle Tenn. Sch. of Anesthesia, Inc.*, Case No. 3:20-cv-00903, 2022 WL 10551094, at *7 (M.D. Tenn. Oct. 18, 2022) ("An educational institution 'is not required to provide accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation.'" (quoting *Newell v. Cent. Mich. Univ. Bd. of Trs.*, No. 20-1864, 2021 WL 3929220, at *8 (6th Cir. Sept. 2, 2021))).

The Sixth Circuit has recognized that, "[d]epending on circumstances, this rule of thumb may not be absolute." *Marble II*, 767 F. App'x at 652 n.2. For instance, "a covered entity may need to proactively institute accommodations where the need for accommodation is 'obvious[.]'" *Id.* (citing *McCoy v. Tex. Dep't of Crim. Just.*, C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006)); *see also Medwick v. W. Mich. Univ. Homer Stryker M.D. Sch. of Med.*, Case No. 1:17-cv-1088, 2020 WL 813157, at *5 (W.D. Mich. Feb. 19, 2020) ("If, for instance, the individual's needs are 'obvious,' that individual's 'failure to expressly "request" an accommodation . . . is not fatal to an ADA claim [because] the defendant otherwise had knowledge of an individual's disability needs, but took no action.'" (alterations in original) (quoting *McCoy*, 2006 WL 2331055, at *7)); *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) (holding, in the Title I employment context, that "when a request would be futile, we have excused the failure to make it when the need for an accommodation was obvious to the employer" (citing *MX Grp. v. City of Covington*, 293 F.3d 326, 343 (6th Cir. 2002))). And the plaintiff "is not required to use magic words such as 'accommodation' and 'disability'" when it is reasonable to infer "'that [a communication] constituted a request for an accommodation.'" *Fisher v. Nissan N.*

*Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)); *see also Yanick v. Kroger Co. of Mich.*, Case No. 23-1439, 2024 WL 1856680, at *4 (6th Cir. Apr. 29, 2024) (affirming district court's denial of summary judgment on employee's ADA reasonable accommodation claim where "[a] reasonable jury could conclude that [the employee] made a request" for an accommodation where employer was aware of her breast cancer diagnosis, surgery, and four-month medical leave, and employee told her manager that "she 'needed some time to get back to normal[,]'" "was struggling," and that the job 'was hard for [her] physically'" (fourth alteration in original) (citations omitted)).

G.E. and S.B. have not alleged typical ADA and Rehabilitation Act failure-to-accommodate claims. They do not argue that they requested accommodations that were refused or that G.E.'s need for accommodations for a disability during fifth and sixth grade was so obvious that WCS should have offered accommodations in the absence of a specific request. Instead, G.E. and S.B. argue that WCS failed to evaluate G.E. to determine whether he required reasonable accommodations for a disability. (Doc. No. 51, PageID# 7888; *see also id.* (arguing that WCS should have provided G.E. with "[r]easonable accommodations upon evaluation").) These claims—that WCS failed to evaluate G.E.'s need for educational accommodations based on disability—are, in essence, child-find claims. Indeed, G.E. and S.B.'s amended complaint asserts their reasonable accommodation claims in the same counts and based on the same facts as their § 504 and IDEA child-find claims. (Doc. No. 44.) And the accommodations that G.E. and S.B. argue that WCS could have provided to G.E. under the ADA and the Rehabilitation Act are the same special education services that they allege WCS should have provided to G.E. under § 504 and the IDEA. (*Compare* Doc. No. 51, PageID# 7888 (arguing that "[r]easonable accommodations upon evaluation could have included exposure therapy, a calming person, and counseling to be

able to regularly access the school" (emphasis omitted)), *with* Doc. No. 44, PageID# 7667, ¶ 39 ("Had the [evaluation] referral occurred, . . . G.E. could have been provided with a Section 504 service plan, or IDEA related services, to include accommodations such as a designated person to assist him, a designated safe space, and counseling to assist G.E.'s mental health." (emphasis omitted)).)

But the ADA does not include a child-find mandate. The regulations implementing the ADA's employment-discrimination protections in Title I provide for "an informal, interactive process" between a covered entity and an employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (quoting *id.*). The employee bears the initial burden of proposing an accommodation to trigger this interactive process. *Jakubowski*, 627 F.3d at 202 ("An employee has the burden of proposing an initial accommodation[.]"); *see also Gantt*, 143 F.3d at 1046 ("The [relevant] interpretive guidelines indicate that generally 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" (quoting 29 C.F.R. subtitle B, ch. XIV, pt. 1630, app.)); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) ("Generally, an ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (quoting *id.*). To the extent that this interactive process applies outside of Title I in the education context, the Sixth Circuit has held that a student likewise bears the initial burden to request reasonable accommodation of a disability to trigger a covered entity's duty to engage in the interactive process. *See, e.g.*, *Mbawe v. Ferris State Univ.*, 751 F. App'x 832,

840 (6th Cir. 2018) (holding that a publicly funded university's "duty to engage in the interactive process was never triggered" because the disabled student "failed to propose any accommodation that would have allowed him to remain qualified to be a pharmacy student"). It is undisputed that G.E. and S.B. did not request or propose any accommodations for a disability during fifth or sixth grade.[6]

The parties have not addressed whether G.E.'s "'disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to" WCS such that it would have been required to institute accommodations proactively in the absence of a request. *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017); *see also Marble II*, 767 F. App'x at 652 n.2 (quoting *McCoy*, 2006 WL 2331055, at *7). At a minimum, and as further discussed herein, the administrative record supports a finding that WCS "knew or should have known that" G.E. suffered from anxiety and other mental health conditions during fifth and sixth grade. *Windham*, 875 F.3d at 237. But "knowledge of a disability is different from knowledge of the resulting limitation. And it certainly is different from knowledge of the necessary accommodation." *Id.* at 238. To prevail on an ADA reasonable accommodation claim in the absence of a specific request for accommodation, the plaintiff typically "must adduce evidence that all three were or should have been obvious." *Id.* (citing *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996)); *see also Adams v. Vanderbilt Univ.*, No. 3:23-cv-00001, 2024 WL 1182861, at *20 (M.D. Tenn. Mar. 19, 2024) ("[F]or this exception to apply, it is not enough that a plaintiff's *disability* be 'open, obvious, and apparent' to the defendant; rather, any limitations resulting from that disability and necessary reasonable accommodations designed to assist with

---

[6] WCS argues that G.E. and S.B. "never requested an accommodation due to a disability during G.E.'s 5th and 6th grade school years[.]" (Doc. No. 52, PageID# 7953.) G.E. and S.B. have not responded to this argument.

the disability must also be 'open, obvious, and apparent' to the defendant." (discussing *Windham*, 875 F.3d at 237)); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 n.10 (10th Cir. 2007) ("[T]he critical component of the [covered] entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services."). "When a disability is mental, rather than physical, the disability, resulting limitations, and necessary reasonable accommodations often are not 'open, obvious, and apparent.'" *J.W. ex rel. Washington v. Paley*, 81 F.4th 440, 450 (5th Cir. 2023) (quoting *Taylor*, 93 F.3d at 165); *see also Adams*, 2024 WL 1182861, at *21 ("The Fifth Circuit itself has acknowledged that making such a showing would be difficult with respect to a mental disability." (citing *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 216 (5th Cir. 2015)).

G.E. and S.B. have not demonstrated or argued that G.E.'s limitations and necessary accommodations were or should have been obvious to WCS. On this record, the Court cannot find that G.E. and S.B. have carried their burden to show that they are entitled to relief under the ADA.

### 2. Child-Find Claims Under the IDEA and § 504

On remand, the ALJ denied all of G.E. and S.B.'s § 504 claims, including their § 504 child-find claims, on the ground that G.E. and S.B. had failed to show evidence of bad faith or gross misjudgment by WCS. (Doc. No. 48-1.) The ALJ separately analyzed G.E. and S.B.'s IDEA child-find claims for fifth grade and sixth grade and found no procedural violations of the IDEA's child-find mandate in either year. (*Id.*)

### a. IDEA Child-Find Claims

The IDEA's child-find "mandate requires all LEAs, such as WCS, to identify, locate, and evaluate '[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]'" *Ja. B.*, 61 F.4th at 500–01 (first and second alterations in

original) (quoting 20 U.S.C. § 1412(a)(3)(A)); *see also T.D.*, 478 F.3d at 313 (citing 34 C.F.R.

§ 300.111(a)(1)). This obligation extends to "[c]hildren who are suspected of being a child with a

disability . . . and in need of special education, even though they are advancing from grade to

grade[.]" 34 C.F.R. § 300.111(c)(1); *see also Ja. B.*, 61 F.4th at 501; *T.D.*, 478 F.3d at 313. The

IDEA "'does not demand that schools conduct a formal evaluation of every struggling student.'"

*Ja. B.*, 61 F.4th at 502 (quoting *D.K. ex rel. Stephen K. v. Abington Sch. Dist.*, 696 F.3d 233, 249

(3d Cir. 2012)). "[A] school's failure to diagnose a disability at the earliest possible moment is not

*per se* actionable, in part because some disabilities 'are notoriously difficult to diagnose and even

experts disagree about whether [some] should be considered a disability at all.'" *Id.* (second

alteration in original). "Ultimately, 'determining whether a child find violation occurred is a fact-

intensive inquiry[.]'" *Id.* (alteration in original) (quoting *Spring Branch Indep. Sch. Dist. v. O.W.*

*ex rel. Hannah W.*, 961 F.3d 781, 794 (5th Cir. 2020)). To establish a violation of the IDEA's

"child-find mandate, 'the claimant must show that school officials overlooked clear signs of

disability and were negligent in failing to order testing, or that there was no rational justification

for not deciding to evaluate.'" *Id.* (quoting *T.D.*, 478 F.3d at 313).

The ALJ analyzed G.E. and S.B.'s IDEA child-find claim as follows:

### Child find in Fifth Grade (2017–2018 School Year)

WCS met its child find obligation as to G.E. during his fifth-grade year at Crockett, as it had no reason to suspect that G.E. was a child with a disability who might need special education services. The Petitioners premise their case on the idea that because G.E. had 40 absences and 24 instances of being late to school, coupled with mental health diagnoses of anxiety and depression, that WCS should have evaluated him for special education services. Taking the record as a whole, there is not a preponderance of evidence showing that WCS should have suspected that G.E. needed special education services.

The Petitioners rely on (1) [S.B.]'s testimony; (2) the August 15, 2017 Health History Form noting "anxiety;" (3) one email to a teacher in November 2017, mentioning therapy at Vanderbilt and stating that G.E. was "having emotional issues/anxiety and trouble with a child on the bus;" (4) an incident in

31

March 2018 where G.E. punched a wall after a classmate made fun of him, and the communications and a meeting with the principal about that incident; (5) a social work referral in March 2018 by the school counselor due to concerns about absences brought to her by G.E.'s teachers; and (6) an email in April 2018 to one of G.E.'s teachers informing her that G.E.'s medication had been increased leading him to have increased anxiety and his sleep being interrupted.

However, school personnel saw a child who was gentle and kind, who "hopped out" of the car at drop off in the morning, interacted appropriately with his peers, and did not exhibit any outward signs of anxiousness. In an email the morning of March 8, 2018, the day after G.E. hit the wall, Ms. Randolph, the school counselor, asked [S.B.] to "[p]lease let me know how I can support [G.E.] on this end. I want to help out however I can." EXHIBIT 50. She never received any follow up from [S.B.] That same day, G.E. and [S.B.] sat down with Crockett's principal, Ms. Rector. Ms. Rector's notes reflect that [S.B.] mentioned that G.E. was struggling with anxiety, depression, and self-image; was seeing a psychiatrist at Vanderbilt; and did not want to come to school. Ms. Rector interpreted the comment about not wanting to come to school as pertaining to that specific day. G.E. also did fine academically during fifth grade. With one exception, his math and reading STAR scores placed him at 65% or above compared to his peers across the country. His achievement test scores also indicated that he was on track, proficient, or approaching in all of his subjects. His grades at the end of the year were all As and Bs except for math, in which he got a C.

For the overwhelming majority of G.E.'s absences, [S.B.] attributed the absence to a physical illness such as strep throat or bronchitis. At trial, she presented nine doctors' notes for appointments during G.E.'s fifth grade year, only one of which bore any indication that it was related to a visit to a mental health professional. Moreover, the record is not clear as to which of these notes were presented to WCS during G.E.'s fifth grade year. [S.B.] regularly communicated by email with G.E.'s teachers and her emails never linked G.E.'s absences or tardiness to his depression or anxiety. A single reference to Ms. Rector in their March 8, 2019 [*sic*], meeting, which may or may not have linked G.E.'s anxiety to not wanting to go to school that day, does not come close to giving WCS a reasonable suspicion that G.E. might be a child in need of special education services due to his anxiety causing absences. Thus, the Petitioners have failed to show that WCS violated its child find obligation as to G.E. in his fifth-grade year.

### Child Find in Sixth Grade (2018–2019 School Year)

In the sixth grade, by all appearances, G.E. was performing better both academically and with his mental health. He had only 18 absences that year, again all of which [S.B.] attributed to physical illness. Still, his teachers were concerned enough to contact [S.B.] to request a parent-teacher conference in late October 2018. [S.B.] understandably could not attend an in-person conference as she was in the midst of relocating her mother from out of state. Therefore, [S.B.] requested to do a phone conference. While Ms. Fall suggested a date and time for a phone

conference, [S.B.] did not confirm, and therefore the conference did not happen. G.E.'s teachers did not follow up to reschedule a conference since they began to see improvement in his attendance and therefore, his grades.

Again, G.E.'s teachers saw in him a sweet young man who wanted to do well. He got along well with others, both peers and adults, and was easy to build rapport with. Again, [S.B.] corresponded regularly with G.E.'s teachers and spoke on the phone several times with Nurse Weingartner. In these interactions, [S.B.] never linked G.E.'s absences with his anxiety or depression. Likewise, G.E.'s academic performance remained steady – his achievement test scores were "approaching" or "on track" in all subjects; he ended the year with a B or high C in all of his academic classes; his math STAR scores ranged from 47% to 64%; his STAR reading scores ranged from 53% to 80%.

While it is WCS' responsibility to proactively identify students who may need special education services, when a student is suffering from a mental health condition that manifests itself at home significantly more than at school, as was the case here, it is incumbent on the parent to communicate the impact it is having on the child's education to school personnel. Tellingly here, [S.B.] apparently does communicate that to CIA in a way that she never did with WCS. If G.E. is having a meltdown over his clothes in the morning, she calls CIA and gets the response to just get him there and they will meet him where he is. TRANSCRIPT, Vol. XV, p. 1746. However, she never gave WCS that opportunity. When she met with G.E.'s fifth grade teachers to discuss his anxiety and feeling overwhelmed, they said to "just get him to school." TRANSCRIPT, Vol. XVI, p. 1872. This is exactly what CIA staff told her, yet somehow in [S.B.]'s estimation, it is helpful when coming from CIA staff but not when coming from WCS staff. G.E. was simply not manifesting anxiety at school in the way he apparently was at home. WSC personnel are not omniscient. To the extent that G.E.'s anxiety was preventing him from getting to school, there was no way for WCS to know that prior to G.E.'s seventh-grade year without [S.B.] communicating it to them which she did not do in any substantial manner. The Petitioners have failed to meet their burden of proof that WCS overlooked clear signs of a disability, was negligent in failing to order testing, or had no rational justification for not evaluating prior to the filing of the due process complaint. Once the complaint was filed, WCS promptly evaluated him. There was no child find violation during G.E.'s fifth or sixth grade years.

(Doc. No. 48-1, PageID# 7784–88.)

G.E. and S.B. argue that, contrary to the ALJ's findings, WCS had enough information about G.E.'s mental health and school absences to trigger its IDEA child-find obligation in late 2017 or early 2018. (Doc. No. 51.) Specifically, G.E. and S.B. point to four "trigger points" during G.E.'s fifth-grade year after which they argue that WCS should have suspected that G.E. was a

child with a disability in need of special education services: (1) November 6, 2017, when S.B. met with three of G.E.'s fifth-grade teachers; (2) March 8, 2018, when G.E. and S.B. met with Rector; (3) March 22, 2018, when Randolph submitted a social-work referral for G.E.; and (4) the end of May 2018, when Stewart signed the social-work record of intervention. (*Id.* at PageID# 7876.) WCS argues that, because S.B. attributed many of G.E.'s absences to physical illness and G.E. was academically successful in 2017 and 2018, it had no reason to suspect that G.E. was disabled and in need of special education services until G.E. and S.B. filed their due process complaint in July 2019. (Doc. No. 52.)

There is no dispute that G.E. was frequently absent from school during the 2017–2018 school year and that WCS was aware of his absences, tardy arrivals, and early dismissals. Nor is there any dispute based on the record evidence that S.B. informed WCS personnel that G.E. suffered from anxiety, depression, and sensory issues, and had started taking Prozac in January 2018. Courts have found that frequent absences caused by a student's anxiety or other mental-health issues, combined with other factors, may provide a reasonable basis for a school district to suspect a student is disabled and in need of special education services under the IDEA. *See, e.g.*, *Indep. Sch. Dist. No. 283 v. E.M.D.H. ex rel. L.H.*, 960 F.3d 1073, 1083 (8th Cir. 2020) (affirming IDEA child-find violation where "District knew that the Student was missing significant time at school as a result of her mental-health issues" and, "[d]espite their knowledge that the Student was suffering from mental-health issues that impacted her ability to attend school, District staff did not refer the Student for a special-education evaluation because she had above-average intellectual ability"); *Karrissa G. v. Pocono Mountain Sch. Dist.*, Civ. Action No. 3:16-CV-01130, 2017 WL 6311851, at *7 (M.D. Pa. Dec. 11, 2017) ("[S]ome courts have noted that when a student suffers from a diagnosed anxiety order, obtains failing grades, and is chronically absent from school, the

district does have a reasonable basis to believe that a student may be disabled."). The dispute here is when WCS should have reasonably suspected that G.E.'s mental-health issues were impeding his ability to attend school such that he might require special education services under the IDEA.

The ALJ found that there was insufficient evidence for WCS to suspect a link between G.E.'s absences and his mental health in fifth grade because, "[f]or the overwhelming majority of G.E.'s absences, [S.B.] attributed the absence to a physical illness such as strep throat or bronchitis" and S.B.'s emails to G.E.'s teachers "*never* linked G.E.'s absences or tardiness to his depression or anxiety." (Doc. No. 48-1, PageID# 7786.) But the administrative record contradicts the ALJ's finding that S.B. attributed the majority of G.E.'s fifth-grade absences to physical illness. Rather, it shows that S.B.'s written communications to WCS personnel only attributed about eighteen of G.E.'s forty-one absences to physical illness. (Doc. Nos. 15-13, 15-16, 15-17.) Specifically, S.B. attributed ten absences between August 2017 and February 2018 to strep throat, flu, or fever.[7] (Doc. No. 15-17, PageID# 7001 (undated note signed by S.B. stating: "Please excuse [G.E.] for being absent 8-30-17, 8-31[-]17 and 9-1-17. He had a stomach virus that we later found out was strep."); Doc. No. 15-16, PageID# 6856 (December 18, 2017 email from S.B. to Konemann stating: "[G.E.] was a[t] Vanderbilt on Friday and they did start him on medication. He has been really sick over the weekend and we have been at Vanderbilt today because he is having trouble breathing along with having strep again."); Doc. No. 15-13, at PageID# 5465 (February 12, 2018 email from S.B. to Smith, Ford, and Konemann stating: "[G.E.] has [a] 101 [degree] fever and is going back to the doctor this afternoon . . . flu stuff is no fun!"); *id.* at PageID# 5494 (February 13, 2018 email from S.B. to Smith, Ford, and Konemann stating: "[G.E.] is still running

_____

[7]    S.B.'s notes and emails during this period correspond to G.E.'s ten excused absences on August 30, 2017; August 31, 2017; September 1, 2017; December 15, 2017; December 18, 2017; and February 12, 13, 14, 15 and 16, 2018. (Doc. No. 15-17.)

a fever of 101 with meds. He DOES have the flu, he will be out most of the week."); Doc. No. 15-17, PageID# 6861 (February 15, 2018 email from S.B. to Smith stating: "[G.E.] has both A & B flu. He's starting a steroid to help with breathing.").) S.B. attributed four absences during the week of March 22, 2018, to "diarrhea[,]" "upset stomach[,]" and "fever[.]" (Doc. No. 15-17, PageID# 6868 (March 22, 2018 email from S.B. to Smith stating: "[G.E.] has had diarrhea and upset stomach all week. His fever is finally gone today so I'm hoping he can return tomorrow.")).) And S.B. attributed four absences to concussion symptoms that G.E. experienced after falling, hitting his head, and losing consciousness at school on April 2, 2018. (Doc. No. 15-17.) Thus, S.B. attributed fewer than half of G.E.'s forty-one absences to physical illness.[8]

Also contrary to the ALJ's finding, the record shows that S.B. provided information linking at least some of G.E.'s absences in fifth grade to his anxiety. It is undisputed that S.B. informed WCS about G.E.'s anxiety in an August 2017 student health history form and in a November 1, 2017 email. (Doc. Nos. 15-16, 15-17.) S.B. testified that she met with three of G.E.'s teachers on March 6, 2017, told them that G.E. was struggling with anxiety and feeling overwhelmed and that the teachers told her that she needed to "'just get [G.E.] to school'".[9] (Doc. No. 15-10,

---

[8]    WCS attendance records show an additional nine medically excused absences for G.E. between October 2017 and May 2018 (Doc. No. 15-17), but there is no indication in the record that S.B. attributed these absences to physical illness beyond providing WCS with generic doctor's notes. The record contains three doctor's notes corresponding to four of these absences, and none specifies the nature of G.E.'s medical condition. (Doc. No. 15-16.) The first note states that G.E. "had a medical visit . . . at The Little Clinic" in Brentwood, Tennessee, on October 9 and 10, 2017 (*id.* at PageID# 6820); the second states that he "was seen at Vanderbilt Outpatient Clinic on 10/18/2017" and "may return to school on 10/19/2017" (*id.* at PageID# 6821); and the third states he "was seen at the Vanderbilt Clinic on 1-26-2018" (*id.* at PageID# 6826).

[9]    The ALJ found that "there is no evidence as to whether that meeting occurred or the outcome" (Doc. No. 48-1, PageID# 7756, ¶ 13), but later relied on S.B.'s testimony about the same meeting to find that, "[w]hen [S.B.] met with G.E.'s fifth grade teachers to discuss his anxiety and feeling overwhelmed, they said to 'just get him to school'" (*id.* at PageID#7787 (quoting Doc.

PageID# 3990.) There is also evidence that, on March 8, 2018—the day after G.E. punched a wall at school in response to teasing from another student and S.B. told Randolph that G.E. was under psychiatric care and taking medication for depression and anxiety—Rector, S.B., and G.E. met and discussed G.E.'s attendance; his anxiety, depression, sensory issues, and related treatment; and the bullying he was experiencing at school, which was connected to his sensory issues. (Doc. Nos. 15-10, 15-12, 15-17.) Rector's notes from that meeting reflect that G.E. "didn't want to come to school" but "chose to go to class" after their meeting.[10] (Doc. No. 15-17, PageID# 6890.) And, on the morning of April 2, 2018, S.B. emailed Smith to tell her that G.E.'s doctor had adjusted his psychiatric medication "and it really made sleeping last night difficult for him. He kept waking up with anxiety, if he's really tired and emotional today, please understand." (*Id.* at PageID# 6869.) Smith responded: "We'll keep an extra eye on him today and hopefully things will get sorted out with this medicine." (*Id.*) A few hours later, G.E. suffered a concussion when he fell in a school hallway, hit his head, and lost consciousness. (Doc. Nos. 15-10, 15-12.) S.B. spoke to the WCS school nurse that afternoon and told her that G.E.'s doctor had increased his Prozac dose to 20 mg from 10 mg four days earlier, that G.E. was experiencing side effects and was up until 2:00 a.m. with anxiety, and that S.B. was waiting to hear back from the doctor about returning G.E. to a

No. 15-10, PageID# 3990)). As G.E. and S.B. point out, there is no evidence in the record that contradicts S.B.'s testimony about the November 6, 2017 meeting. (Doc. No. 51.)

[10]     Rector testified that the reasons S.B. gave during the meeting for G.E.'s absences were that "he had a number of doctor appointments over the months, that he had A and B flu, and she indicated he just had a lot of illness." (Doc. No. 15-10, PageID# 4310.) As discussed above, the administrative record reflects that doctor appointments and physical illnesses did cause some of G.E.'s absences. But the administrative record, including WCS's own attendance records, also shows that G.E. had a high number of unexcused absences, and it is undisputed that S.B. discussed G.E.'s anxiety, depression, and sensory issues with Rector during the same meeting. (Doc. Nos. 15-10, 15-12, 15-17.)

37

lower dose. (Doc. No. 15-12.) G.E. was marked absent from school on April 3, 4, 5, and 6, 2017.

(Doc. No. 15-17.) In an email to Smith on April 5, 2017, S.B. wrote:

> It's been a long week for him. Today is the first day he was able to get up without feeling nauseous, getting pale, dizzy and clammy. He's still having headaches but rotating ibuprofen and Tylenol helps. He has not been able to do any work because he would get bad headaches requiring a complete dark room and cold cloth over his head and eyes. He is panicking about his work, I told him you guys understand he was knocked out, ha[s] a concussion and it takes time to heal. He really wants to come to school tomorrow. We are going to try it and see how he does. No sports or physical activities and sunlight is still affecting him so it may benefit him to stay inside during recess.

(*Id.* at PageID# 6870.) S.B. thus did provide WCS with information during G.E.'s fifth grade year connecting some of his absences to anxiety and depression, and sensory issues.

It remains G.E. and S.B.'s burden to show by a preponderance of the evidence that WCS overlooked clear signs that G.E. had a disability that required special education services and was negligent in failing to order testing or lacked a rational justification for deciding not to evaluate G.E. *See Ja. B.*, 61 F.4th at 502; *T.D.*, 478 F.3d at 313. The record shows that WCS overlooked signs of G.E.'s increasingly serious anxiety and depression and information that S.B. provided linking his mental health to his poor attendance. However, "courts typically only find [child-find] violations where the school district ignored a marked increase in concerning behavior by the student that was accompanied by a marked decline in academic performance." *Northfield City Bd. of Educ. v. K.S. ex rel. L.S.*, Civ. No. 19-9582, 2020 WL 2899258, at *9 (D.N.J. June 3, 2020), *aff'd*, 847 F. App'x 130 (3d Cir. 2021); *see also T.D.*, 478 F.3d at 314 (affirming district court's finding that school district did not violate IDEA's child-find mandate where student "did not start to fall significantly below grade level until the middle of his second-grade year"); *J.S. ex rel. J.G. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 663 (S.D.N.Y. 2011) (finding no child-find violation where "any academic decline [the student] showed by the end of the semester was

less severe than those identified by courts that have found emotional disturbances impacting 'educational performance'").

For example, in *A.W. ex rel. H.W. v. Middletown Area School District*, Civ. Action No. 1:13-CV-2379, 2015 WL 390864 (M.D. Pa. Jan. 28, 2015), the plaintiffs argued that the defendant school "was on notice that A.W. suffered from a disability no later than the beginning of the 2011–2012 school year[,]" A.W.'s eighth-grade year, based on evidence of "A.W.'s anxiety, absenteeism, school avoidance, failing grade in social studies, and suspension due to defiant behavior in seventh grade." *Id.* at *10. The court found that "the record indicates that A.W. experienced anxiety during seventh grade" and that "A.W.'s mother testified that A.W. had difficulty attending school due to anxiety and informed [A.W.'s principal] about A.W.'s anxiety issues." *Id.* There was also evidence "that A.W.'s anxiety increased significantly in the beginning of eighth grade"; "that A.W. was absent on an alarming number of days in the first quarter"; and that "A.W.'s mother met with the District in October 2011 to discuss A.W.'s difficulties in school." *Id.* However, the court found that, "[n]otwithstanding this earlier evidence of a potential IDEA-qualifying disability, the record supports the Hearing Officer's finding that the District's duty to evaluate A.W. was not triggered until November 1, 2011[,]" when A.W.'s final grades for the first quarter of eighth grade became available showing "four failing grades," and A.W.'s mother contacted the district's superintendent and assistant superintendent "to discuss her concerns with reasonable specificity." *Id.* In *Malloy v. District of Columbia*, No. 20-cv-03219, 2022 WL 971208 (D.D.C. Mar. 30, 2022), the court found a child-find violation where the student's "consistently low grades, poor test scores, and teachers' concerns, along with his abysmal attendance record, more than put [the school district] on notice . . . that he might have a learning or behavioral disability." *Id.* at *6; *see also N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 27 (D.D.C. 2008)

(finding that school district violated its IDEA child-find obligation where, in addition to knowledge of student's suicide attempt and psychiatric hospitalization, school district "also knew that beginning in 2002, [student's] academic performance began to deteriorate severely, such that in 2003, she failed four of her seven classes when she had previously been an A and B student").

The administrative record in this case does not contain evidence of the kind of significant or long-term decline in academic performance indicating a need for special education services that courts look for to support a child-find violation. *See Ja.B.*, 61 F.4th at 503 (first discussing *T.D.*, 478 F.3d at 313–14; and then discussing *N.G.*, 556 F. Supp. 2d at 18, 24, 26–27). G.E. and S.B. argue, in the context of their seventh-grade IDEA eligibility claims, that "children need not *fail* to be eligible for FAPE." (Doc. No. 51, PageID# 7903.) The plaintiffs in *Dougall ex rel. A.D. v. Copley-Fairlawn City School District Board of Education*, Case No. 5:17cv1664, 2020 WL 435385 (N.D. Ohio Jan. 28, 2020), made a similar argument in support of their child-find claims, arguing "that 'receiving good grades does not prohibit receiving an IEP.'" *Id.* at *21 (citation omitted). The court "d[id] not disagree" with this general proposition, *id.*, and neither does this Court. Nevertheless, the *A.D.* court found that the plaintiffs had not carried their burden to show a child-find violation because they "ha[d] not directed this Court's attention to evidence that would suggest that the [school district] should have been aware . . . that [the student] needed special education services due to behavioral, social, or emotional issues." *Id.* Here, there is no evidence that G.E. received failing grades during the 2017–2018 or 2018–2019 school year. (Doc. Nos. 15-12, 15-17.) Nor is there evidence that G.E. performed below grade level. *Cf. T.D.*, 478 F.3d at 314 (affirming district court's finding that school district did not violate child-find where student "was meeting expectations in all academic areas" and "did not start to fall significantly below grade level until the middle of his second-grade year"). Instead, G.E. finished fifth grade with two As,

two Bs, and one C (Doc. No. 15-12); he finished sixth grade with two Bs and two Cs. (Doc. No. 15-17). While there is evidence that G.E. punched a wall at school on one occasion in response to teasing from another student (Doc. Nos. 15-12, 15-13), G.E. and S.B. have not argued that this isolated incident demonstrates a marked increase in concerning behavior. Instead, they characterize "G.E. punching a wall and injuring his hand at school" as "an event" that "brought G.E.'s mother and school personnel together again . . . ." (Doc. No. 51, PageID# 7879.)

To support their argument that WCS violated its child-find obligation, G.E. and S.B. rely on an unpublished letter from the U.S. Department of Education's Office for Civil Rights (OCR) finding that a school district in Broward County, Florida, "violated Section 504 when it failed to timely evaluate two kindergarten students with bipolar disorder who were excessively absent from school." (Doc. No. 51-1, PageID# 7919.) WCS objects that "cases investigated by OCR . . . do not carry persuasive authority" and argues that the OCR letter "specifically states that it[ ] . . . 'is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.'" (Doc. No. 52, PageID# 7932 (quoting Doc. No. 51-1, PageID# 7926).) G.E. and S.B. have not responded to WCS's argument, and they concede in their opening brief that "decisions of OCR are case specific[.]" (Doc. No. 51, PageID# 7874 n.3.) The OCR letter is thus of little value in considering G.E. and S.B.'s claims.

The cases G.E. and S.B. cite to support their child-find arguments are legally and factually distinguishable. In *Culley ex rel. J.C. v. Cumberland Valley School District*, 758 F. App'x 301 (3d Cir. 2018), the Third Circuit held that a defendant school district's knowledge of a student's diagnosed Crohn's disease was "sufficient to trigger its Section 504 obligations to ensure that [the student] received whatever accommodations he might require for his Crohn's disease, as no one disputes that Crohn's is sufficient to trigger Section 504 coverage." *Id.* at 306. The court further

held that, because there was evidence in the administrative record that the student "experienced severe academic decline and numerous disciplinary issues[,]" the school district "at least should have investigated the question of whether [his] numerous issues stemmed from his debilitating, life-threatening disease in a way that would be helped by accommodations." *Id.* The court applied the same analysis to the student's child-find claims "under the IDEA, given that [the student] is IDEA-eligible and that among other warning signs was his declining academic performance." *Id.* G.E. and S.B. have not identified similar evidence of "severe academic decline" or "numerous disciplinary issues" here.

G.E. and S.B. cite the Fifth Circuit's opinion in *O.W.* for the uncontroversial proposition that "the IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students." (Doc. No. 51, PageID# 7875 (quoting 961 F.3d at 793).) But the facts and circumstances of *O.W.* do not support G.E. and S.B.'s argument that WCS violated its IDEA child-find obligation here. In *O.W.*, there was no dispute that the school district's IDEA child-find obligation was triggered by a § 504 eligibility meeting during which "the [s]chool [d]istrict determined that [the student], who was removed from class on a daily basis due to his disruptive behavior, qualified for § 504 accommodations." 961 F.3d at 787, 793. Again, the record does not reflect similarly significant events regarding G.E.

G.E. and S.B. also cite the Third Circuit's opinion in *M.C. ex rel. J.C. v. Central Regional School District*, 81 F.3d 389 (3d Cir. 1996), but there were no child-find claims at issue in that case. Rather, the student was already receiving special education services under the IDEA and claimed that the defendant school district deprived him of a FAPE because it knew or should have known that his IEP was inadequate and did not take reasonable steps to modify the IEP. *Id.* at 391–93. The *J.C.* court held that, because the student had already been identified as IDEA eligible and

had an IEP in place, "it [was] the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly." *Id.* at 397.

Finally, G.E. and S.B. rely on *Jana K. ex rel. Tim K. v. Annville-Cleona School District*, 39 F. Supp. 3d 584 (M.D. Pa. 2014), for the proposition that, "[i]n cases involving attendance and behavior, the school's evidence to evaluate is often a 'mosaic,' not a single event." (Doc. No. 51, PageID# 7875 n.4 (quoting *Jana K.*, 39 F. Supp. 3d at 603).) In that case, the court found that one piece of the evidentiary mosaic triggering the school district's child-find obligation was evidence that the student began receiving failing or near failing grades in several classes. *See Jana K.*, 39 F. Supp. 3d at 592, 601. There is no evidence that G.E.'s academic performance similarly suffered because of a disability so as to trigger WCS's child-find obligation under the IDEA.

For these reasons, G.E. and S.B. have not shown that they are entitled to relief on their IDEA child-find claims.

### b. § 504 Child-Find Claims

G.E. and S.B.'s child-find claims under § 504 are based on the same facts and seek the same relief as their IDEA child-find claims. (Doc. No. 44.) Courts typically find that, in this circumstance, denial of the IDEA claims is dispositive of the § 504 claims. *See, e.g.*, *J.M. ex rel. C.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 147 (3d Cir. 2022) (holding that, where "parents do not succeed on their [IDEA] denial-of-FAPE-claim, and they offer no additional evidence in support of their § 504 claim[,]" "it is not necessary to analyze whether the § 504 claim may be brought as a companion to the denial-of-FAPE-claim" because "the failure of the denial-of-FAPE claim would still foreclose the § 504 claim"); *D H H ex rel. Rob Anna H. v. Kirbyville Consol. Indep. Sch. Dist.*, No. 1:18-CV-00120, 2020 WL 1644365, at *3 (E.D. Tex. Jan. 7, 2020) (finding

that denial of IDEA claim was dispositive of § 504 claim "as both claims arise from the same factual content and seek the same relief"), *report and recommendation adopted*, 2020 WL 1638061 (E.D. Tex. Apr. 1, 2020); *cf. Culley*, 758 F. App'x at 306 ("Because both the IDEA Child Find and the Section 504 claims involve what [the school district] knew or should have known at what point in time, we will analyze them together.").

G.E. and S.B. have not argued that the Court should conduct a separate analysis of their child-find claims under § 504. *See C.M.*, 39 F.4th at 147; *but cf. B.S.M. ex rel. Gabrielle M. v. Upper Darby Sch. Dist.*, --- F.4th ---, No. 23-1595, 2024 WL 2822919, at *6 (3d Cir. June 4, 2024) (holding that district court should have conducted separate child-find analysis under § 504, in addition to IDEA child-find analysis, where plaintiffs' "claims under both laws [were] plainly different" and "the differences in the statutes' definitions of disability . . . [were] central to the family's argument"). Instead, the parties' arguments focus on whether the Sixth Circuit requires an additional showing by the plaintiff of bad faith or gross misjudgment by the defendant LEA to prevail on a § 504 child-find claim. (Doc. Nos. 51–53.) Because G.E. and S. B. did not establish a child-find violation under the IDEA and have not argued that a different analysis governs the same claims under § 504, they cannot establish a child-find violation under § 504, whether or not an additional showing of bad faith or gross misjudgment is required.

## B. Seventh-Grade Claims

G.E. and S.B.'s remaining claims are that WCS violated the IDEA in G.E.'s seventh-grade year, the 2019–2020 school year, by failing to classify G.E. as a student with emotional disturbance or other health impairments under the IDEA during the September 2019 eligibility meeting and by failing to identify G.E. as IDEA-eligible later in the school year. (Doc. Nos. 44, 51.)

44

### 1. September 2019 IDEA Eligibility Classification Claims

The IDEA defines a "child with a disability" to include a child with "emotional disturbance" or "other health impairments," among other qualifying conditions, "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A)(i)–(ii). The statute requires states to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A). In conducting evaluations, a LEA must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent[;]" "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child;" and "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2)(A)–(C); *see also* 34 C.F.R. § 300.304.

Because the IDEA and federal and state regulations set forth procedures for determining a child's eligibility for special education and related services, courts "'strictly review'" compliance with those procedures. *Burilovich*, 208 F.3d at 566 (quoting *Dong*, 197 F.3d at 800); *Deal*, 392 F.3d at 854 (same). A claim that a defendant LEA failed to identify a child as eligible for services under the IDEA thus raises a procedural violation of the statute. *See, e.g.*, *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 789 (6th Cir. 2018) ("Procedural violations generally concern 'the preparation of an IEP,' such as the evaluation, placement, and IEP-formation procedures outlined in [20 U.S.C.] § 1414." (quoting *Rowley*, 458 U.S. at 206)); *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990) (explaining that procedural claims concern "the process by which the IEP is produced, rather than the myriad of technical items that must be included in the written document"). "A finding of procedural violations does not necessarily entitle [plaintiffs] to relief."

*Deal*, 392 F.3d at 854. "[R]ather, a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Knable*, 238 F.3d at 765. "Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process" or "deprive an eligible student of an individualized education program or result in the loss of educational opportunity . . . ." *Id.* at 765–66.

The ALJ analyzed G.E.'s IDEA eligibility claim as follows:

### Eligibility as of September 18, 2019

Based on the allegations in the due process complaint filed in July 2019, WCS requested and was granted consent to evaluate G.E. for IDEA and/or Section 504 eligibility. As to the IDEA, G.E. was evaluated under the categories of (1) ED, (2) OHI, and (3) autism.[11] While it was apparent that G.E.'s anxiety, which was much more significant at home than at school, was beginning to appear on occasion at school, at the time of the eligibility meeting, he did not meet the criteria for either ED or OHI.

WCS, through school psychologist Jessica Keezer, conducted an extremely thorough and comprehensive evaluation. The evaluation considered [S.B.]'s input, Dr. Paul's evaluation, classroom observations, psychological tests, ratings scales, input from G.E.'s sixth grade teachers, a comprehensive review of G.E.'s records for his entire time in the school district (back to second grade), his grades, test scores, nurses' visits, and attendance reports. Ms. Keezer's evaluation clearly and comprehensively laid out all of the information available at the time and more than met WCS' obligation to conduct a thorough evaluation of G.E. While the Petitioners do not believe enough weight was given to [S.B.]'s input and Dr. Paul's evaluation, [S.B.] was an active participant in the eligibility meeting and Dr. Paul's evaluation was explicitly incorporated into Ms. Keezer's report, all of which was appropriately considered by the team. The Petitioners' arguments to the contrary are meritless.

ED is defined as:

---

[11]    "The IEP team, including [S.B.], all agreed that G.E. was not eligible under the category of autism. Therefore, it will not be discussed further." (Doc. No. 48-1, PageID# 7788 n.10.)

46

(i) [A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

> (C) Inappropriate types of behavior or feelings under normal circumstances.

> (D) A general pervasive mood of unhappiness or depression.

> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4).

As of September 18, 2019, G.E. may have met the condition of having an "[i]nappropriate . . . feeling under normal circumstances" given his irrational fear of zombies. If he did, he had not shown that condition to a marked degree, he had not shown it over a long period of time, and it had not affected his educational performance. In seventh grade and prior to September 18, G.E.'s anxiety had manifested itself at school in (1) a panic attack on August 22, 2019, (2) his inability to complete the dyslexia screening in Ms. Burnette's class, (3) demonstrating tics during his evaluation with Ms. Keezer, and (4) repeatedly erasing and rewriting during his testing with Ms. Keezer. Still, there were instances of G.E. doing well. For example, he completed and did well on his First Day Essay assignment, and two days after the meeting, Ms. Stepanic noted very appropriate, positive peer interactions. Further, at this point, school had been in session for less than two months. The evidence does not show that these characteristics had existed over a long period of time.

The Petitioners argue that his absences and being late to school were being caused by anxiety at home. However, contrary to this argument, the evidence shows that [S.B.] provided alternate reasons for his absences and tardiness over, and over, and over again. In retrospect, she now says that she was uncomfortable writing the real reason for being late because the sign in sheet was on the counter in the school office and available for anyone to see. This excuse is not credible given that she never mentioned it to anyone prior to the hearing and because the record is devoid of any evidence that she made any attempt to inform school personnel in a more private manner of the reasons for his tardiness. She regularly communicated with

school personnel by email; during the seventh-grade year she referenced the fact that he had anxiety and was struggling. However, [S.B.] never hinted at a link between his tardiness and his anxiety.

Moreover, none of the evidence relied on by the Petitioners of G.E.'s anxiety or absences demonstrates an adverse impact on his education. G.E. performed at or above grade level, never failed a class, and was successful socially. As of the September 18, 2019, eligibility meeting, G.E. did not qualify for services from WCS under the IDEA in the category of ED.

OHI is defined as:

[H]aving limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

(ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9).

There is virtually no evidence in the record of G.E. having "limited strength, vitality, or alertness, or heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment;" much less, that any such condition was adversely affecting G.E.'s educational performance. In retrospect, G.E.'s mental health did continue to decline, apparently very rapidly as he was admitted to Rogers' partial hospitalization program less than a month later. Second guessing the decision in retrospect does not establish proof of eligibility. Moreover, the proof does not support that conclusion. Both Ms. Griego and Ms. Stepanic testified, even knowing that G.E.'s decline continued, that the correct decision was made at the eligibility meeting based on the information that was available to the team at the time. The Petitioners have failed to meet their burden of proof to show that G.E. was eligible to receive special education services under the disability category of OHI.

It is abundantly clear that G.E. had not been suffering anxiety at school for an extended period of time given that school had only been in session a few weeks at the time of the eligibility meeting. It is equally clear that his condition did not adversely affect his educational performance to a marked degree. Even with his history of absences, G.E. scored at or above grade level on standardized tests, he never failed a class, and he demonstrated appropriate and positive interactions with peers and adults. Moreover, WCS took appropriate steps to help G.E. cope with his anxiety. Ms. Stepanic met with him regularly, coached him on techniques like deep

48

breathing to calm himself, gave him a pass to leave class when he needed a break, and worked with him to develop a plan to catch up on work. The Petitioners have failed to prove by a preponderance of the evidence that G.E. was eligible for special education services under the IDEA.

(Doc. No. 48-1, PageID# 7788–91.)

G.E. and S.B. argue that, contrary to the ALJs findings, G.E. should have received a disability classification of emotional disturbance or other health impairment entitling him to an IEP under the IDEA during the September 2019 evaluation. (Doc. Nos. 44, 51.) Among other things, G.E. and S.B. challenge the ALJ's finding that G.E.'s conditions did not adversely impact his educational performance as required to meet the federal and state regulatory definitions of ED and OHI.[12] (Doc. No. 51.)

The IDEA assigns school districts the responsibility "to determine the educational needs of" children with disabilities during an "initial evaluation" process. 20 U.S.C. § 1414(a)(1)(C)(i)(II). However, neither the IDEA nor its implementing regulations provide definitions of "the terms 'need special education' or 'adverse effect on educational performance[.]'" *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000); *see also Q.W. ex rel. M.W. v. Bd. of Educ. of Fayette Cnty.,* 630 F. App'x 580, 582 (6th Cir. 2015) ("'Educational performance' is left undefined."), *cert. denied*, 578 U.S. 945 (2016). While states may choose "to give substance to these terms[,]" *J.D.*, 224 F.3d at 66, the relevant Tennessee educational regulations do not, *see* Tenn. Comp. R. & Regs 0520-01-09-.02 (2019).

The Sixth Circuit addressed the meaning of "educational performance" in *Q.W.*, holding that, "[a]bsent a contrary directive" in state law, "'educational performance' may encompass more than academic achievement[,]" but "the plain meaning of 'educational performance' suggests

---

[12]     The applicable Tennessee educational regulations define ED and OHI similarly to the federal definitions. *See* Tenn. Comp. R. & Regs. 0520-01-09-.02(7), (14) (2019).

school-based evaluation." 630 F. App'x at 582, 583. Specifically, educational performance means "the classroom and school experience—to the exclusion of social or behavioral deficits that were not shown to interfere with [a student's] school-based performance." *Id.* at 583. The Sixth Circuit has not articulated a standard for determining whether a student needs special education under the IDEA, but the Fifth Circuit has "held that courts must consider the 'unique facts and circumstances' of each case[.]" *Lisa M. ex rel. J.M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 216 (5th Cir. 2019) (quoting *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 383 (5th Cir. 2007)); *cf. W. Chester Area Sch. Dist. v. Bruce C. ex rel. Chad C.*, 194 F. Supp. 2d 417, 420 (E.D. Pa. 2002) ("There is no precise standard for determining whether a student is in need of special education, and well-settled precedent counsels against invoking any bright-line rules for making such a determination.").

G.E. and S.B. argue that the IEP team agreed that his mental health had caused an adverse impact on G.E.'s educational performance because the team "believed 'his absences impacted his ability to perform to his capabilities.'" (Doc. No. 51, PageID# 7902 (quoting Doc. No. 15-5, PageID# 2219).) They rely on *E.M.D.H.* for the proposition that "the adverse impact of [ ] absences" can qualify a student "for an IEP for both Emotional Disturbance and Other Health Impairment" and that "good test scores [are] no barrier[.]" (Doc. No. 51, PageID# 7904.) In *E.M.D.H.*, the record showed that the student was "frequently absent from school" in "the fall of her eighth-grade year, . . . telling her mother that she was afraid to go" and that, "[b]y the last quarter of eighth grade, the [s]tudent was consistently absent from school and was placed in a psychiatric day-treatment facility." 960 F.3d at 1077. Because "[t]he [s]tudent's teachers were aware that her absences were due to her mental-health issues[,] [they] noted her schoolwork as incomplete rather than entering failing grades." *Id.* Based on this and other evidence, the Eighth

Circuit held that "[t]he [s]tudent's absences from the classroom" adversely affected her educational performance by "put[ting] her well behind her peers in, among other things, earning the number of credits needed to graduate[.]" *Id.* at 1082. The court also rejected the defendant school district's argument "that the [s]tudent [was] simply too intellectually gifted to qualify for special education" because her "high standardized test scores and her exceptional performance on the rare occasions she made it to class are strong indicators that there are no services it can provide that would improve her educational situation." *Id.*

G.E. and S.B. argue that the record shows G.E.'s academic performance was below his full capabilities—for example, they argue that G.E.'s "TCAP[ ] [scores] were negatively impacted by his absences . . . ." (Doc. No. 51, PageID# 7903.) But the Supreme Court has long held that the IDEA does not require school districts "to *maximize* each child's potential commensurate with the opportunity provided other children." *Rowley*, 458 U.S. at 198; *see also T.D.*, 478 F.3d at 314 (quoting *id.*). The Fifth Circuit has therefore held that, in the context of determining a student's IDEA eligibility and need for special education and related services, "'need' should not be measured according to 'whether or not [a student's] potential could be maximized via special education services.'" *J.M.*, 924 F.3d at 216 (alteration in original) (quoting *A.D.*, 503 F.3d at 384 n.9). Rather, as the special education hearing officer in that case correctly found, the student "meaningfully struggled in general education" and special education services "'will only provide [the student] with the same opportunity to succeed as other students, not at all assistance to meet his maximum potential.'" *Id.* at 219. Thus, the proposition that special education services could have helped G.E. optimize his standardized test scores does not demonstrate an adverse effect on his academic performance.

G.E. and S.B. rely on *Preciado v. Board of Education of Clovis Municipal Schools*, 443 F. Supp. 3d 1289, 1299 (D.N.M. 2020), to support their argument that "getting bogged down into whether G.E. was passing academically misses the point." (Doc. No. 51, PageID# 7904.) In *Preciado*, there was no dispute about the student's IDEA eligibility because the student was already receiving special education services under the IDEA. 443 F. Supp. 3d at 1293. Instead, the portion of the court's opinion that G.E. and S.B. cite analyzed whether the school district provided the student with "an IEP reasonably calculated to enable [her] to make appropriate progress under the circumstances[.]" *Id.* at 1299. The court affirmed the hearing officer's determination that, under the circumstances of that case, "appropriate progress" meant "perform[ing] academically at her grade level." *Id.* at 1300. Here, the ALJ expressly found—and the record supports—that "G.E. performed at or above grade level[.]" (Doc. No. 48-1, PageID# 7790.) G.E. and S.B. have not challenged that finding, nor have they shown by a preponderance of the evidence that G.E. needed special education and related services to perform at grade level.

G.E. and S.B. cite *Chad C.* for the same general proposition as *Preciado*. (Doc. No. 51, PageID# 7903.) In *Chad C.*, the court recognized that, while "[t]here is no precise standard for determining whether a student is in need of special education," the Supreme Court "has clearly repudiated the notion that grades can serve as [the] IDEA's litmus test[.]" 194 F. Supp. 2d at 420, 421 (citing *Rowley*, 458 U.S. at 203 n.25). There, the record showed that the student "was generally placed in the most challenging tier of classes" during his eighth-grade year; that his "grades in several major subjects dropped significantly over the course of the academic year"; and that, during his ninth-grade year, the student's "highest placement [was] in . . . the third highest level of academic classes." *Id.* at 419. The Court found that the student's "class placement and grades fail[ed] to tell the whole story" because, "[t]hroughout much of [his] schooling, [the student's]

mother ha[d] worked with him on a daily basis, typically two or three hours each school night plus additional time on the weekends, to ensure assignments were completed and [the student] was prepared for tests." *Id.* When his "mother became less involved with his studies during his eighth grade year . . . , [the student's] grades dropped considerably." *Id.* The record does not show that G.E. suffered similar adverse effects on his academic performance.

G.E. and S.B. cite *Williamson County Board of Education v. C.K. ex rel. C.*, No. 3:07-0826, 2009 WL 499386 (M.D. Tenn. Feb. 27, 2009), for the general proposition that "children need not *fail* to be eligible for FAPE." (Doc. No. 51, PageID# 7903.) In that case, the court affirmed the ALJ's finding that WCS violated the IDEA's child-find provision by "fail[ing] to identify and evaluate [the student] for special education services no later than the beginning of seventh grade" based, in part, on record evidence that the student's parent gave the district a copy of a comprehensive psychoeducational evaluation at the beginning of sixth grade diagnosing the student with ADHD, concluding that he met "'State of Tennessee criteria for Gifted/Learning Disabled'" special education services, and offering "five pages of recommendations covering attention/behavior, writing, spelling, reading comprehension, listening comprehension, study skills, and school accommodations/modifications" to address the student's "'unique needs[.]'" *C.*, 2009 WL 499386, at *3, *4, *15. At the due process hearing, the student's expert witness "explained at length why school officials, upon receiving a copy of the [ ] report on [the student's] entrance into the sixth grade, should have immediately considered [the student] for special education . . . [,] explained why the [ ] report did not qualify [the student] for special education[,] *or* . . . undertaken their own evaluation if necessary to explain why the [ ] report would not be followed." *Id.* at *18. The ALJ credited the expert's testimony over "conflicting testimony by the school's educations[,]" and the court found that the ALJ's credibility determinations were "entitled

to deference and due weight . . . ." *Id.* The court further found that "other evidence showed [that] [the student's] disability of ADHD adversely affected his educational performance[,]" including evidence that the student's "academic performance remained inconsistent from quarter to quarter, with grades ranging from Fs to As, and his academic achievement suffered." *Id.* Again, the record here does not show significant adverse consequences for G.E.'s academic performance.[13]

Considering the record as a whole and the parties' arguments, G.E. and S.B. have not shown by a preponderance of the evidence that G.E.'s mental health conditions adversely affected his educational performance within the meaning of the IDEA and its federal and state implementing regulations. Thus, G.E. and S.B. are not entitled to judgment on their IDEA eligibility classification claim, and the Court need not consider their alternative arguments challenging the ALJ's finding that G.E. did not exhibit ED characteristics for a long period of time and to a marked degree.

### 2. IDEA Claims After September 2019

G.E. and S.B. argue that WCS continued to violate the IDEA for the duration of G.E.'s seventh-grade year by failing to identify G.E. as a disabled student eligible for special education services as the academic year continued. (Doc. No. 51.)

The ALJ analyzed these claims as follows:

**IDEA Claims After September 18, 2019 (remainder of 2019-2020 School Year)**

G.E. last attended Woodland on October 2, 2019; he was admitted into Rogers' partial hospitalization program on October 7, 2019. On October 16, 2019, G.E. was approved to receive homebound services. Ms. Tepner, G.E.'s homebound teacher, provided homebound instruction to him consistently until WCS closed schools due to the COVID-19 pandemic on March 5, 2020. While both sides were

---

[13]    G.E. and S.B. also point to other evidence in the record, including S.B.'s testimony that G.E. became overwhelmed while trying to complete his homework and repeatedly erased his answers. The ALJ considered that evidence in reaching her conclusion that the record did not support a finding that G.E.'s mental health adversely affected his academic performance.

sometimes late to sessions, thus cutting into the already limited time allotted to the homebound teacher, homebound services are not meant to be a long-term solution but are a stop gap measure to keep students afloat academically until the student can return to school. It is unfortunate that Ms. Tepner and G.E. had such limited time to work together, but that does not establish a violation of child find or FAPE.

During the time that she provided homebound services, Ms. Tepner worked diligently and creatively with G.E. to make the most of their time together. The Petitioners further argue that in working with G.E., Ms. Tepner used special education techniques. To the contrary, the proof shows that the methods she used are best practice techniques that can be used with either general education or special education students.

At the point that WCS shut down because of the pandemic, school was closed and no WCS students were receiving educational instruction. Still, in order help G.E. complete his seventh-grade year, Ms. Tepner remained in communication with [S.B.], offered suggestions, and offered to arrange a video conference with G.E. and one of his classroom teachers. No such conference ever happened. Ms. Tepner fulfilled WCS' obligation to provide educational instruction to G.E. while he was approved for homebound services.

The Petitioners make much of Dr. Sherwood's conclusion that at some point between September 18, 2019, and Dr. Sherwood's evaluation in August 2020, G.E. began to meet some of the criteria for ED. However, the Petitioners are incorrect that Dr. Sherwood's conclusion established G.E.'s IDEA *eligibility*. For a student to be eligible under the ED category, a student must meet BOTH one of the ED criteria AND that condition must have existed over a long period of time and adversely affected the child's educational performance. 34 C.F.R. § 300.8(4). Dr. Sherwood reached NO conclusion as to the length of time the condition had existed OR whether it had adversely impacted G.E.'s educational performance.[14] Thus, neither Dr. Sherwood's testimony nor his report provides proof of G.E.'s IDEA eligibility.

Moreover, WCS requested at least twice that the Petitioners attend another meeting with WCS personnel to consider Section 504 eligibility, reconsider IDEA eligibility, and establish a transition plan to reintegrate G.E. back into school. These requests were declined. A parent has an obligation to participate in the eligibility determination process. *See, C.H. v. Cape Henlopen School District*, 606 F. 3d 59, 69–70 (3rd Cir. 2010). [S.B.]'s continued refusals to reconvene an eligibility

---

[14]     "As to the length of time this condition might have existed for G.E., Dr. Sherwood testified that late summer of August 2019 was the earliest point at which the question of whether G.E. was emotionally disturbed could have been considered, NOT that the condition had existed since then. WCS comprehensively considered that question in August and September 2019 through Ms. Keezer's report and a considered discussion at the September 18, 2019, eligibility meeting." (Doc. No. 48-1, PageID# 7793 n.11.)

meeting after September 18, 2019, thwarted the cooperative process necessary to reintegrate G.E. into WCS schools and to potentially establish IDEA or Section 504 eligibility. The Petitioners have failed to prove by a preponderance of the evidence that G.E. was eligible under the IDEA or that WCS failed in its child find obligation at any point between September 18, 2019, and the hearing.

(Doc. No. 48-1, PageID# 7792–93.)

G.E. and S.B. argue that WCS should have identified G.E. as IDEA-eligible at several junctures: October 10, 2019, when Rogers Behavioral Health provider Dr. Lenoue certified that G.E. was unable to attend school and needed homebound educational services; November 2019, when WCS began providing G.E. with homebound instruction; November 22, 2019, when Rogers Behavioral Health provided G.E.'s "Treatment Plan" to WCS reflecting G.E.'s diagnoses of ADHD, generalized anxiety disorder, obsessive compulsive disorder, and unspecified depressive disorder (Doc. No. 15-13, PageID# 5484); January 2020, when G.E. was discharged from Rogers Behavioral Health and began outpatient treatment with Dr. McKay; February 2020, when WCS spoke to Dr. McKay by phone about G.E.'s request to continue homebound services and the possibility of transitioning G.E. back to Woodland; and March 2020, when Dr. McKay sent WCS a letter providing additional "medical reasoning in support" of G.E.'s homebound services request (Doc. No. 15-14, PageID# 5715). (Doc. No. 51.)

To dispute the ALJ's finding that G.E.'s homebound instruction did not demonstrate his need for special education services, G.E. and S.B. rely on *Board of Education of Uniondale Union Free School District v. J.P. ex rel. S.P.*, No. CV-18-1038, 2019 WL 4315975 (E.D.N.Y. Aug. 23, 2019), for the proposition that "[t]he fact that some . . . services may also be considered 'best teaching practices' or 'part of the district's regular education program' does not preclude those services from meeting the definition of 'special education' or 'related services' and being included in the child's IEP." (Doc. No. 51, PageID# 7908 (quoting *S.P.*, 2019 WL 4315975, at *12).) But the fact that an instructor used teaching techniques that could be considered both best practices

and special education services does not require a finding that the student needed special education services or that the school district was obligated to evaluate—or, in this case, reevaluate—a student's IDEA eligibility. And there is no indication in the record of whether or how G.E. benefitted from any such instruction.

G.E. and S.B. rely on *Fitzgerald ex rel. S.F. v. Camdenton R-III School District*, 439 F.3d 773 (8th Cir. 2006), and *Ridley School District v. M.R. ex rel. E.R.*, 680 F.3d 260 (3rd Cir. 2012), for the uncontroversial proposition that the IDEA's child-find mandate imposes an ongoing obligation on school districts to locate, identify, and evaluate students suspected of having disabilities and needing special education services. (Doc. No. 51.) But neither *S.F.* nor *E.R.* supports a finding that WCS violated the IDEA in this case. In *S.F.*, the school district "initiated a due process hearing under the 'child-find' provisions of the IDEA" to obtain the right to evaluate a student for IDEA eligibility even though the students' parent "expressly waived all benefits under the IDEA" and withdrew the student "from public school to educate him at home." 439 F.3d at 774. The Eighth Circuit held that "Congress intends that a district may not force an evaluation under the circumstances in this case. Where a home-schooled child's parents refuse consent, privately educate the child, and expressly waive all benefits under the IDEA, an evaluation would have no purpose." *Id.* at 777. In *E.R.*, the Third Circuit held that, where a school district evaluated a student at the end of one academic year and found that she did not qualify as a student in need of special education services under the IDEA, the school district did not violate the IDEA "by failing to immediately reevaluate her" at the beginning of the following school year. 680 F.3d at 273. The court explained that, "[w]hen a school district has conducted a comprehensive evaluation and concluded that a student does not qualify as disabled under the IDEA, the school district must be afforded a reasonable time to monitor the student's progress before exploring whether further

evaluation is required." *Id.* It therefore assessed whether the "school district identified and evaluated [the] student . . . within a reasonable time 'in light of the information and resources possessed' by the district.'" *Id.* (quoting *W.B. ex rel. E.J. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995)).

In fact, *E.R.* tends to support WCS's argument that G.E. and S.B. have not shown that IDEA child-find violations occurred after September 2019 because "it had only been a few months since G.E. was evaluated and determined ineligible under [the] IDEA." (Doc. No. 52, PageID# 7965.) WCS relies on the Sixth Circuit's holding in *Ja. B.* that, "[i]n cases that have found child-find violations, the observed behaviors that indicated a possible disability occurred over a longer time-frame—usually multiple years." *Ja. B.*, 61 F.4th at 503. WCS argues that it had insufficient time, information, and cooperation from S.B. after September 2019 to assess G.E.'s educational needs, particularly given that S.B. refused to participate in further meetings about G.E.'s educational needs and refused to let WCS's expert conduct a clinical psychological evaluation of G.E. until the ALJ ordered her to do so in August 2020. (Doc. No. 52.) S.B. and G.E. have not responded to WCS's argument.

Further, the Sixth Circuit reiterated in *Ja. B.* "that a school [does] not violate its child-find responsibilities by first attempting other interventions for a student instead of immediately referring for an evaluation." 61 F.4th at 503 (first citing *T.D.*, 478 F.3d at 313–14; and then citing *D.K.*, 696 F.3d at 249, 252). Here, WCS argues that the record shows it was trying to evaluate G.E.'s educational needs by conducting another clinical psychological evaluation and by speaking with G.E.'s treating psychiatrist to develop a plan to transition G.E. back to Woodland. WCS states that it was stymied in these efforts when S.B. refused to allow the psychological evaluation and

58

refused to participate in a § 504 meeting to discuss creating a transition plan. (Doc. No. 52 (citing Doc. Nos. 15-9, 15-11–15-14).)

On this record, G.E. and S.B. have not shown that WCS violated the IDEA by failing to identify G.E. as a student requiring special education services after September 2019.

### C. Conclusion

The administrative record shows that G.E. struggled with anxiety and other mental health concerns during his final years in WCS schools. The ALJ's opinion erroneously minimized what WCS knew about those struggles and, in particular, how they related to G.E.'s absences in fifth grade and sixth grade. But the record as a whole does not support a finding that WCS's responses to G.E.'s struggles or its assessment of G.E. as a student violated the ADA, § 504, or the IDEA. Because G.E. and S.B. have not shown that WCS violated these statutes, the Court need not address their corresponding requests for relief.

**III.     Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that G.E. and S.B.'s motion for judgment on the administrative record (Doc. No. 51) be DENIED and that the ALJ's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 6th day of June, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge